FEDERAL INSURANCE COMPANY AND ANOTHER v. DENNIS PRESTEMON AND OTHERS.
SCHMELZ BROTHERS, INC., AND ANOTHER, APPELLANTS.

153 N. W. (2d) 429.

October 6, 1967—No. 40,490.

*Hoppe & Healy* and *Robert J. Healy,* for appellant Schmelz Brothers.
*Richards, Montgomery, Cobb & Bassford* and *Lynn G. Truesdell, III,* for respondents.

MURPHY, JUSTICE.

Appeal from a judgment in a declaratory action determining the rights of insurance carriers growing out of an accident in which Donald W. Judkins, while driving an automobile loaned to him by Schmelz Brothers, Inc.'s garage, collided with an automobile owned by Carol Prestemon. Judkins was given the use of the accident-involved car while

his personally owned automobile was being repaired. Public liability on Schmelz Brothers' garage operations was carried by Guaranty Security Insurance Company. Public liability on Judkins' automobile was carried by Federal Insurance Company. The litigation grows out of conflicting provisions in the two policies as to which company should defend and answer for damages in the event Judkins is ultimately liable. In the context of the record we are asked to determine if a "temporary substitute automobile" under one policy of automobile liability insurance can be a vehicle which is "furnish[ed] * * * for * * * regular use" under another policy where, by stipulation of the parties, it is agreed that the vehicle was loaned to the bailee for his regular use, to be used unrestrictedly and regularly for business and pleasure as he would his own car.

It is agreed that at the time of the accident Judkins was operating a Chevrolet automobile lent to him by Schmelz Brothers and that he was operating it with their knowledge and consent while his Thunderbird automobile was in the Schmelz garage for repairs and servicing. Federal's complaint alleges that Guaranty issued its garage operations liability insurance policy to Schmelz Brothers, which listed the Chevrolet as an owned automobile, and that under the terms of that policy Judkins was also an insured. The complaint alleges that the Federal insurance contract with Judkins provided only for excess insurance over and above other valid and collectible insurance under circumstances where a non-owned automobile is driven by the insured as a temporary substitute for the owned automobile withdrawn from normal use for repair or servicing. The complaint further alleges that, as a result of the accident, the Prestemons commenced an action against Schmelz Brothers and Judkins seeking recovery of damages; that in that action Schmelz Brothers was being defended by Guaranty and Federal was defending Judkins; and that Guaranty had refused to accept a tender of the defense from Federal as to the claims against Judkins. It is not disputed that the limits of coverage under the Guaranty policy are sufficient to cover the claims asserted by the Prestemon suit. The trial court was asked to determine or allocate the respective liabilities of the two companies in the event a

judgment growing out of the accident was ultimately entered against Judkins.

The Federal policy which covered Judkins at the time of the accident contained an "other insurance" clause providing that, in case of overlapping coverage of a "temporary substitute automobile," the Federal coverage would be "excess." The clause reads:

"Other Insurance: If the insured has other insurance against a .loss covered by Part I of this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other. valid and collectible insurance."

"Temporary substitute automobile" was defined in the Federal policy as—

"* * * an automobile or trailer, not owned by the named insured, while temporarily used with the permission of the owner as a substitute for the owned automobile or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction; * * *."

At the time of the accident, Schmelz Brothers was insured by a policy of the Guaranty Security Insurance Company. The Guaranty policy defined its "unqualified insured" as follows:

"(a) Insured. The unqualified word 'Insured' wherever used also includes any partner, executive officer, director or stockholder thereof while acting within the scope of his duties as such.

"The coverage afforded under this insuring agreement with respect to automobiles owned by, registered in the name of, or hired by the Insured, is extended to any other person, firm or corporation while using or legally responsible for the use thereof, provided such use is with the permission of an Insured or his spouse, who is the legal or registered owner of or hires the automobile, and if such Insured is an individual,

he may give such permission through an adult member of his household other than a domestic servant or chauffeur."

Under separate sections, "Hazards" were defined:

"A.   Hazards Defined:

"Garage Operations Hazard: The ownership, maintenance or use of the premises for the purposes of a garage, and all operations necessary or incidental thereto, hereinafter called 'garage operations'; including the

"Automobile Hazard:

"(a)  the ownership, maintenance or use of any automobile for the purpose of garage operations, and the occasional use for other business purposes and the use for non-business purposes of any automobile owned by or in charge of the named insured and used principally in garage operations;

"(b)  the ownership, maintenance or use of any automobile owned by the named insured in connection with garage operations while furnished for the use of (i) the named insured, a partner therein, an executive officer thereof or, if a resident of the same household, the spouse of any of them, or (ii) any other person or organization to whom the named insured furnishes automobiles for their regular use."

And a qualified definition of "Insured" appeared:

"B.   Definition of Insured:

"Persons insured: Each of the following is an insured with respect to the Garage Operations Hazard, except as provided below:

\*     \*     \*     \*     \*

"(3)  with respect to the Automobile Hazard:

\*     \*     \*     \*     \*

"(b)  any person while using an automobile to which the insurance applies under Paragraph (b) of the Automobile Hazard with the permission of the person or organization to whom such automobile is furnished, provided such person's actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission."

The garage operations provisions defining "persons insured" were amended by an endorsement which provided:

"1. Paragraph 3 of 'Persons Insured' is amended to read as follows, and Paragraphs 4 and 5 below are added, all subject to exceptions (i), (ii), (iii) and (iv) as set forth in the policy.

" '(3) With respect to an automobile to which the insurance applies under Paragraph 1(a) of the Automobile Hazards, any of the following persons while using such automobile with the permission of the named insured, provided such person's actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission:

(a) [not applicable]

(b) any other person, but only if no other valid and collectible automobile liability insurance, either primary or excess, with limits of liability at least equal to the minimum limits specified by the financial responsibility law of the state in which the automobile is principally garaged, is available to such person; * * *

" '(4) With respect to an automobile to which the insurance applies under Paragraph 1(b) of the automobile hazards, any person while using such automobile with the permission of the person or organization to whom such automobile is furnished, provided such person's actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission; * * *.' "

The issues presented were submitted to the trial court on a stipulation of facts which, in addition to those already stated, included the following:

"IV.

"Donald W. Judkins was operating the said Chevrolet automobile on January 18, 1965, because the vehicle which he owned, a 1962 Thunderbird had been left at Schmelz Brothers for repairs and servicing, and Schmelz Brothers had loaned the said Chevrolet to Judkins for his regular use and as a substitute for his 1962 Thunderbird, to be used unrestrictedly and regularly for business and pleasure, and as he would his own car while his own car was thus temporarily withdrawn from normal use.

## "V.

"On January 18, 1965, Guaranty insured Schmelz Brothers, as named insured, under a garage liability policy affording automobile liability insurance, a true and correct copy of which policy, including all endorsements, is hereto attached, and marked Exhibit A. Said policy listed the said Chevrolet automobile as an automobile owned by Schmelz Brothers and as a vehicle for which a specific premium charge was made and received by Guaranty.

## "VI.

"On and prior to January 18, 1965, Schmelz Brothers, among other things, was engaged in the business of repairing and servicing automobiles owned by others. The loan of the said Chevrolet to Judkins by Schmelz Brothers herein was in accordance with Schmelz Brothers' business practice of loaning its vehicles to its customers under circumstances similar to those present here."

The trial court declared in favor of Federal, stating that:

"However much the underwriters at Guaranty may have desired to avoid liability coverage for vehicles which were furnished for restricted or limited uses by persons who had excess coverage in other insurance companies, no such intention was stated in the policy for vehicles used by persons to whom Schmelz furnished Schmelz-owned cars for their unrestricted use and for use as their own car. Judkins was such a person and accordingly was a '1(b)' risk under Guaranty's policy."

■ It is asserted by Guaranty that Judkins was not insured by its policy at the time of the accident. In support of this contention, Guaranty points to paragraph (b) under the section of its policy which defines "Hazards." That particular section protects and insures Schmelz Brothers, the named insured, a partner, an executive officer, a resident of the same household, a spouse of any of them, or "any other person or organization to whom the named insured furnishes automobiles for their regular use." Just who this "other person" may be whom the underwriter had in mind is not indicated. If not a customer, it would not have been a waste of words to say so. It may be considered that it would cover an employee under certain circumstances. Guaranty argues, how-

ever, that it could not apply to a customer using a Schmelz automobile provided for the customer's accommodation, since such use could not be a "regular use."

Both parties cite numerous authorities from which it appears that the term "regular use" has been considered in numerous decisions relating to liability insurance. While none of them provide a pat definition of the term, they all seem to agree that its application must turn upon the particular facts in each case.

Le Mense v. Thiel, 25 Wis. (2d) 364, 130 N. W. (2d) 875, involved the construction of a "regular use" clause in a similar policy. An employee was permitted to, and often did, use for his personal needs any car in his employer's lot. There, the Wisconsin court held that such personal use was a "regular use" within the meaning of the employer's policy. The court, noting the difficulty in applying the term to the wide variety of situations in which the problem is found, observed that there was no difficulty with cases where the use is "sporadic and rigidly restricted" at one end of the spectrum and with cases at the other end where the use is "unqualified and continuous." In its analysis of the employee's use in the case before it, the Wisconsin court concluded:

"* * * In our opinion, the instant case polarizes toward that end of the spectrum where the use of the automobile is unlimited and regular." 25 Wis. (2d) 367, 130 N. W. (2d) 876.

The court in Brouillette v. Fireman's Fund Ins. Co. (La. App.) 163 So. (2d) 389, 392, ventured the following definition:

"The words 'regular use' connote: used according to some established rule or principle; a use steady or uniform in course, practice, or occurrence (as contrasted to unexplained or irrational variation); use in conformity with established or prescribed rules. [Webster's New International Dictionary (2 ed.) (1960)] verbo 'regular', p. 2099. See also 36A Words and Phrases (1962 volume) verbo 'regular', p. 241, verbo 'regular use', p. 301."

A broader understanding of the phrase is indicated by the Oregon court in George B. Wallace Co. v. State Farm Mutual Auto. Ins. Co. 220 Ore. 520, 526, 349 P. (2d) 789, 792. That court said:

"We are of the opinion, therefore, that the phrase 'furnished for regular use' as used in context does not imply the manner of use, that is, putting the automobile to the same uses to which an insured would use his own automobile, but implies a right to the regular use of the automobile in the sense that there is an expressed or implied understanding with the owner of an automobile that the insured could have the use of the particular automobile or perhaps any automobile of the other at such times as he desired, if available."

The appellant relies on Lincombe v. State Farm Mutual Auto. Ins. Co. (La. App.) 166 So. (2d) 920, where State Farm's insured used a "loaner" car provided her by an automobile dealer insured by Travelers until a car which she had purchased should arrive. Travelers' policy contained a "regular use" clause similar to that in the Schmelz Brothers' policy with Guaranty. There the Louisiana court held that "regular use" did not include the temporary use which the customer made of the loaner. The reasons that there could be no "regular use," the court said, were, first, that the dealer made no commitment to furnish the customer a particular automobile and, second, that the dealer had a right to take the car back at any time without violating any duties owed to the customer. It seems to us, however, that the force of this authority has been diminished by Judge Tate's concurring opinion in State Farm Mutual Auto. Ins. Co. v. Travelers Ins. Co. (La. App.) 184 So. (2d) 750, 753, which was a sequel to Lincombe. He expressed the view that the construction given to the term ignores the "total policy insuring intent" of the insurer who undertakes to insure a vehicle used in the business of maintaining a garage or automobile service business.[1]

The trial court considered numerous other authorities, including Rodenkirk for Use of Deitenbach v. State Farm Mutual Auto. Ins. Co. 325 Ill. App. 421, 60 N. E. (2d) 269, and Aler v. Travelers Ind. Co. (D. Md.) 92 F. Supp. 620, and concluded that the status of the automobile rather than the special purpose for which it is being used at the

---

[1] Judge Tate's opinion will be referred to more fully in the discussion to follow, relating to the conflicts between "other insurance" provisions in the two policies.

moment determines the question of whether or not the use is "regular." The trial court's determination was influenced by the terms and underlying purpose of the Guaranty policy, which insured risks relating to "maintenance or use of any automobile for the purpose of garage operations" and "use of any automobile owned by the named insured in connection with garage operations while furnished for use." If there was any doubt as to what this language meant, the trial court felt that the stipulation of facts requires the same result. By the stipulation of facts it was agreed that at the time of the accident the Schmelz' Chevrolet was lent to Judkins for his "regular use" to be unrestrictedly and regularly used for business and pleasure while his own automobile was withdrawn from use for repairs. We conclude that the trial court was correct in determining that Judkins was an insured under the Schmelz' policy not only because of the stipulation but also because the policy is designed to protect Schmelz in its garage business. As a part of that business, it lent automobiles to its customers. It is conceded by counsel that this is a common business practice. If the underwriters intended that the policy not include the use of loaners to customers, they could have easily said so. Under the most favorable aspect of construction, it may be said that at the very most the language chosen by Guaranty is ambiguous and must be construed in favor of Judkins, thereby yielding the same result. Quaderer v. Integrity Mutual Ins. Co. 263 Minn. 383, 116 N. W. (2d) 605.

■ We next come to the oft-recurring issue growing out of conflicts between two insurance policies, both of which purport to restrict or escape liability for a particular risk in the event there is other insurance. Guaranty contends that it cannot be liable because of the endorsement in its policy which purports to limit liability with relation to the definition of "persons insured," by which coverage is provided only "if no other valid and collectible automobile insurance, either primary or excess * * * is available to such person." The conflicting provision in Federal's policy affords only excess coverage to Judkins when he is operating a "temporary substitute automobile." Federal claims that, by the very nature of its "excess coverage," its policy presupposes a primary

policy as to which it will be excess, and, customarily, that policy is the one covering and listing the vehicle involved in the accident.

Both parties cite innumerable authorities relating to the meaning and application of terms such as "excess insurance," "no liability," "other insurance," and "temporary substitute automobile" in support of their contentions that each should escape liability because of the way in which the policies are written. In the absence of an accepted lexicon of insurance words and phrases, one insurance company cannot anticipate that all other insurance companies will intend that a given word or phrase should mean practically the same thing always and under precisely the same circumstances. It should be assumed that insurance policies, and particularly policies issued to a business organization, are drawn to fit the particular needs of the insured. Every policy must therefore be treated as an individual contract, the language of which can only be understood in reference to the insured's insurable circumstances. In our early decision of Commercial Cas. Ins. Co. v. Hartford Acc. & Ind. Co. 190 Minn. 528, 530, 252 N. W. 434, 435, in a case involving liability of carriers providing overlapping coverage, we noted, "The two contracts of insurance and their interpretation must be the factual basis of decision." It was noted that there was "no contractual relation between the insurers. Neither was beneficiary of the other's contract. Neither having any contract right against the other, but both being under contractual obligations in respect to the same risk, it remains only to determine the respective equities."

A great many authorities have considered the question of how the respective rights of carriers furnishing overlapping coverage should be resolved. Annotations, 46 A. L. R. (2d) 1163, 1165, 69 A. L. R. (2d) 1122, and 76 A. L. R. (2d) 502; Note, 38 Minn. L. Rev. 838. It is the general rule that where one of the policies contains an "excess insurance" and the other contains a "no liability" clause, the conflict has been resolved by imposing liability on the insurer issuing the policy containing the "no liability" clause. The reason behind this holding is that the policy providing "excess insurance" only does not in fact provide other valid and collectible insurance so far as the "no liability" clause of the other policy is concerned. Eicher v. Universal Underwriters, 250 Minn. 7, 83

N. W. (2d) 895; Corcoran v. The State Auto. Ins. Assn. 256 Minn. 259, 98 N. W. (2d) 50; Olson v. The Hertz Corp. 270 Minn. 223, 133 N. W. (2d) 519; Travelers Ind. Co. v. National Ind. Co. (8 Cir.) 292 F. (2d) 214; Bituminous Cas. Corp. v. Travelers Ins. Co. (D. Minn.) 122 F. Supp. 197; National Ind. Co. v. Lead Supplies, Inc. (D. Minn.) 195 F. Supp. 249; Citizens Mutual Auto. Ins. Co. v. Liberty Mutual Ins. Co. (6 Cir.) 273 F. (2d) 189; State Farm Mutual Auto. Ins. Co. v. Travelers Ins. Co. (La. App.) 184 So. (2d) 750, 753 (Judge Tate's concurring opinion); Woodrich Const. Co. v. Indemnity Ins. Co. 252 Minn. 86, 89 N. W. (2d) 412; Annotation, 46 A. L. R. (2d) 1165; 7 Am. Jur. (2d) Automobile Insurance, § 202; 8 Appleman, Insurance Law and Practice, § 4914.

■ It seems to us that the most persuasive Minnesota authority is found in Olson v. The Hertz Corp. *supra*. In that case an automobile owned by a car-rental company and operated by one of its employees was involved in an accident. Both policies involved—the one issued to the Hertz company and the other to the employee personally—contained "other insurance" clauses of the excess type. In holding that the two policies were not concurrent but that Hertz' insurer's obligation was primary and the employee's policy was excess only, we emphasized that the accident-involved vehicle was covered by insurance to protect the operator of an automobile used in a business operation from liability. We considered the nature of the use of the automobile compared to premium charges made to meet liability exposure arising out of the insured's business, as opposed to the operator's personal coverage which protected against liability arising from ownership, maintenance, and use of a pleasure vehicle used for nonbusiness purposes and concluded that, under the circumstances, the insurer of the accident-involved automobile was primarily liable. In the case before us, Judkins' use of the Chevrolet was clearly incidental to Schmelz' Brothers business practice of lending vehicles to customers, a practice for which Schmelz obtained insurance protection. Certain criteria were expressed in Olson for determining the respective responsibility of carriers providing overlapping insurance, among which are: (1) Which company by its policy intended to cover "business operations"? (2) Which company specifically described the

accident-involved vehicle in its policy? (3) Which premium is reflective of the greater contemplated exposure? (4) Which company insured the particular risk as an "incident" of its object, and which policy appears to cover the particular car and the risks inherent in using the car for contemplated "business operations" uses? Guaranty specifically wrote the business-related automobile risks and listed this particular vehicle in its policy, coverage for which was one of the principal bases of premium computation.[2]

While Guaranty's charge for premium reflected "the greater contemplated exposure," Federal's policy wrote an excess or "incidental" exposure on a temporary substitute vehicle which, by definition, arises in the language of the Olson case as "a mere incident of its object which was to guard against liability arising from the ownership, maintenance, and use of the described pleasure vehicle owned by [the insured] and used by him generally for a nonbusiness purpose." 270 Minn. 228, 133 N. W. (2d) 524. Guaranty attempts to distinguish Olson by arguing that in that case the rental agency was "trying to reduce its insurance cost by sneaking in on all the policies issued to employees, rentees, or anyone else they could find." By the same token, it might be said that, under the terms of Guaranty's policy, Schmelz is attempting to reduce its insurance costs by attempting to secure the benefit of all of the policies issued to its customers.

The most interesting and persuasive discussion of the reason for imposing primary liability on the insurer of the accident-involved car is found in Judge Tate's concurring opinion in State Farm Mutual Auto. Ins. Co. v. Travelers Ins. Co. *supra*. This case, a sequel to Lincombe v. State Farm Mutual Auto. Ins. Co. *supra,* was brought by one of the

---

[2] It is argued by Guaranty that as a result of its limited coverage endorsement, the premium was reduced $139.88. It does not seem to us that this reduction, which is somewhat less than 5 percent of the premium of $2,998.95, reflects a premium reduction which would represent the elimination of a potentially large segment of the automobile risk. Counsel for Guaranty represents that this case is important because of the large number of liability cases arising from loaner automobile situations and represents that his firm alone has at present 10 such cases pending.

insurance companies to recover judgment for the amount paid in behalf of its insured. It was held in Lincombe that both of the insurers were primary insurers with respect to the automobile furnished to the driver by the dealer, rendering each insured liable for damages in proportion to respective policy limits. In his concurring opinion, Judge Tate noted that since Lincombe was decided there has been a growing development in the law relating to the subject of apportionment of loss between insurers providing overlapping coverage whose policies contain conflicting provisions. While adhering to the majority opinion because it stated the law of the case, he expressed the view that recent authorities, including Olson, furnished sound reasons for allocating liability in a manner different from that applied to the two insurers in the Lincombe situation. Recognizing the hopelessness of an attempt by the courts to fairly reconcile the various conflicting clauses in separate policies where each company "attempts to make its own liability category secondary to that of any other," he compared the process of construction to an exercise in chasing "the primary and (attempted) secondary liability of each policy * * * through infinity, something like trying to answer the question: which came first, the chicken or the egg?" 184 So. (2d) 754. The better approach, he suggested, is to allocate respective policy coverages in the light of the total policy insuring intent, as determined by the primary policy risks upon which each policy's premiums were based and as determined by the primary function of each policy. He also said:

"In each instance, this is primarily determined by the vehicle or vehicles of the accident-vehicle's *owner*, i.e., the named insured, and by the more foreseeable risks of insuring his actual or consented-to use of the vehicle or vehicles particularly insured. The policies are primarily (i.e., particularly or especially) issued to insure the maintenance, operation, or use of such specific vehicles by the owner or by others with his consent. The contemplated use of these vehicles, rather than of any non-owned vehicles incidentally or occasionally used, furnishes the most significant basis for the insurer's determination of the premium to be charged for the issuance of the policy." 184 So. (2d) 754.

In applying these views to this case, the insurer of the accident-

involved automobile would be the primary insurer and the escape clause contained in its policy would be "legally ineffective to exculpate it from the liability primarily insured by it." On the other hand, the insurer of the customer's car would be an excess insurer since the operation of the loaned car was "ancillary" to the primary coverage of the operation of the customer's automobile. 184 So. (2d) 754. We expressed the same view in Olson when, in holding that the conflicting clauses in the policies would not cancel each other out so as to distribute the loss ratably between the two insurers, we said:

"* * * This would be true if it were not for the fact that the policy of insurance issued by Atlantic appears to have been designed specifically to meet the liability exposure here involved, whereas the policy of insurance issued by Mutual Creamery appears to afford coverage as a mere incident of its object, which was to guard against liability arising from the ownership, maintenance, and use of the described pleasure vehicle owned by Lindstrom and used by him generally for a nonbusiness purpose." 270 Minn. 228, 133 N. W. (2d) 523.

We accordingly hold under the stipulated facts that the trial court properly concluded that Judkins was entitled to coverage under Guaranty's policy and that Guaranty's policy afforded primary coverage here. We further hold that by the weight of authority the excess clause contained in the Federal policy prevails over the escape clause contained in the Guaranty policy.

Affirmed.

OTIS, JUSTICE (dissenting).

I cannot agree that there is any ambiguity or uncertainty in the terms of the liability policy written by Guaranty to cover Schmelz Brothers, Inc., the garage which owned the Chevrolet loaned to its customer, Donald Judkins, for his temporary use during the time Judkins' Thunderbird was being repaired. If, as seems clear to me, the Guaranty policy excluded such use by Judkins, it is incumbent on Federal, which is Judkins' own liability carrier, to defend and assume any liability imposed on Judkins.

There can be no question but that the garage and its carrier,

Guaranty, contracted for only limited coverage of automobiles owned by the garage in its business operations. The record discloses that the garage carrier substantially lowered its premium in consideration of reduced exposure. It seems obvious to me that by its terms the policy contemplated coverage for cars owned and used in the garage business only by partners, executive officers, and other persons and employees specifically connected with the operation of the garage. As I read the policy, it took into account the fact that customers would invariably be insured by their own liability carriers and hence would need no duplicate coverage unless a garage-owned car happened to be driven by someone having no other insurance, in which case the garage insurer assumed liability.

The pertinent provisions of Guaranty's policy covering the garage are as follows:

"A.   Hazards Defined:

\*     \*     \*     \*     \*

"Automobile Hazard:

\*     \*     \*     \*     \*

"(b) the ownership, maintenance or use of any automobile owned by the named insured in connection with *garage operations* while furnished for the use of (i) the named insured, a *partner* therein, an *executive officer* thereof or, if a resident of the same household, the spouse of any of them, or (ii) *any other person or organization to whom the named insured furnishes automobiles for their regular use.*" (Italics supplied.)

■   As I construe the policy, the following limitations emerge: Liability coverage applied only to cars owned by the garage and used in connection with its garage operations; except where the driver of a garage car was not otherwise insured by some other carrier, coverage of garage-owned cars was limited to partners, executive officers and their spouses, and other officers, owners, or employees who had access to garage-owned vehicles consistently and continuously while connected with the company, either for their own personal use or for company business. I cannot see how the words "other person or organization to whom the named insured furnishes automobiles for their regular use"

can possibly be construed to mean a customer borrowing what is called a "loaner" as a temporary substitute while his own car is being repaired. The definition of "regular" which I believe governs is "steady or uniform in course, practice, or occurrence." [1] To say that a customer who borrows a garage car for a day or for several days or even a week has been furnished an automobile for his regular use simply flies in the face of what I regard as the plain and ordinary distinction between regular use and temporary use.

■ Equally important, it occurs to me that under the doctrine of ejusdem generis the words "other person or organization" must necessarily be included in the class referred to immediately preceding that phrase in the garage policy, namely, partners and executive officers. In other words, I believe that "other person" was intended to be limited to others identified with the garage such as salesmen, mechanics, and other employees, many of whom are accorded the privilege of retaining for their personal use company vehicles for extended periods of time.

In consideration of the reduced premium for this type of coverage, it seems to me that the garage carrier intended to confine its coverage to a group of drivers over whom the garage could exercise some supervision and control without insuring blindly all prospective customers whose identity, driving habits, and numbers were necessarily unknown to the garage and its insurer.

■ The end result I propose seems just to me in that the Federal policy, covering the customer Judkins, assumed the risk of a driver known to it, whether that driver was using his own vehicle or a "temporary substitute." Since the cause of an accident is almost invariably the driver and not the vehicle, it does not seem unfair to require the driver's own company to assume responsibility for his negligence rather than arrive at a strained construction to impose liability on the blameless owner of the car involved. Here the exposure of the driver's own carrier was not in any way increased because it was still only insuring one driver without respect to what car he was using. To hold the garage carrier liable, on the other hand, would impose a burden on the garage

---

[1] Webster's Third New International Dictionary (1961) p. 1913.

and its carrier wholly unrelated to any cause or connection between the car which it furnished and the happening of the accident. It was the driver insured by Federal who caused the accident and not the car furnished by Guaranty's insured.

For the reasons stated I submit that at the time of the accident the "loaner" car furnished by the garage to its customer Judkins was clearly a temporary substitute vehicle and not one assigned for the regular use of someone connected with the operation of the garage as I believe the policy contemplated. For that reason I respectfully dissent and would hold that the garage policy with Guaranty did not afford Judkins coverage at the time of the accident and therefore his own carrier, Federal, should assume the burden of the defense and any liability imposed on Judkins.

PETERSON, JUSTICE (dissenting).
I join in the dissent of Mr. Justice Otis.