UNITED STATES FIDELITY AND GUARANTY COMPANY, BALTIMORE, MARYLAND, Plaintiff,

v.

LIBERTY MUTUAL INSURANCE COMPANY, BOSTON, MASSACHUSETTS, Defendant.

Civ. No. 68–192.

United States District Court,
M. D. Pennsylvania.

May 25, 1971.

John W. Bour, O'Malley, Morgan, Bour & Gallagher, Scranton, Pa., for plaintiff.

Hugh J. McMenamin, Warren, Hill, Henkelman & McMenamin, Scranton, Pa., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

SHERIDAN, Chief Judge.

In this action tried to the court without a jury, the issue is which of the insurance policies issued by the respective parties provided coverage on a vehicle involved in an accident in which Mr. and Mrs. John P. Loftus sustained personal injuries resulting in their deaths.

Mr. Loftus purchased a Ford Mustang from Linden Motors, Inc., a Ford agency. On October 29, 1965, Loftus returned the Mustang to Linden for service. William G. Barnhart, president of Linden, informed Loftus the service could not be completed on that date and offered to lend him a company-owned demonstrator. At first Loftus declined the offer, but during the evening of October 29, he decided to drive to Montrose, Pennsylvania,

and borrowed a 1966 company-owned Ford from Barnhart, who was his next door neighbor. While enroute to Montrose, the Ford, driven by Loftus, collided with a truck. Mrs. Loftus died later the same day from injuries received in the accident. Mr. Loftus was rendered unconscious and remained unconscious until his death on May 2, 1967.

The Mustang was covered by a standard family automobile policy issued to Loftus by plaintiff, United States Fidelity and Guaranty Company (Fidelity). It insured against bodily injury liability to the extent of $50,000 for each person and $100,000 for each accident. The Ford was covered by a policy issued to Linden by defendant, Liberty Mutual Insurance Company (Liberty).

The administratrix of the estate of Mrs. Loftus brought a wrongful death and survival action in this court, asserting that negligence of Mr. Loftus caused the accident. The guardian of the estate of Mr. Loftus turned the complaint over to Fidelity to defend and to pay any judgment in accordance with its policy. Fidelity in turn requested Liberty to defend on the ground that its policy provided primary coverage. Liberty refused and Fidelity undertook the defense. The action was settled for $25,200 which Fidelity paid, together with $2,256.80 in counsel fees and costs. Fidelity brought this action against Liberty, contending that Liberty was the primary insurer covering Loftus, that the Fidelity policy was only secondary or excess, and that Liberty should have defended and paid the settlement. The parties agree that the settlement and attorney's fees are fair and reasonable.

The Liberty policy contained the following standard provisions:

"Automobile Hazards

1. All Automobiles

(a) The ownership, maintenance or use of any automobile for the purpose of garage operations, and the occasional use for other business purposes and the use for non-business purposes of any automobile owned by or in charge of the named insured and used principally in garage operations, and

(b) The ownership, maintenance or use of any automobile owned by the named insured while furnished for the use of (i) the named insured, a partner therein, an executive officer thereof or, if a resident of the same household, the spouse of any of them, or (ii) any other person or organization to whom the named insured furnishes automobiles for their regular use.

\* \* \* \* \* \*

Persons Insured. Each of the following is an insured under Part I, except as provided below:

\* \* \* \* \* \*

(3) With respect to the Automobile Hazard:

(a) any person while using, with the permission of the named insured, an automobile to which the insurance applies under paragraph 1(a) or 2 of the Automobile Hazards, provided such person's actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission.

(b) any person while using an automobile to which the insurance applies under paragraph 1(b) of the Automobile Hazards with the permission of the person or organization to whom such automobile is furnished, provided such person's actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission,"

These provisions were amended by an endorsement which provided in pertinent part:

"In consideration of the reduced rate of premium made applicable to the insurance under Part I, it is agreed that the policy is amended as follows:

1. Paragraph 3 of 'Persons Insured' is amended to read as follows, and Paragraphs 4 and 5 below are

added, all subject to exceptions (i), (ii), (iii) and (iv) as set forth in the policy.

'(3) With respect to an automobile to which the insurance applies under paragraph 1(a) of the Automobile Hazards, any of the following persons while using such automobile with the permission of the named insured, provided such person's actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission:

(a) any employee, director or stockholder of the named insured, any partner therein and any resident of the same household as the named insured, such employee, director, stockholder or partner,

(b) any other person, but only if no other valid and collectible automobile liability insurance, either primary or excess, with limits of liability at least equal to the minimum limits specified by the financial responsibility law of the state in which the automobile is principally garaged, is available to such person;

\*    \*    \*    \*    \*

'(4) With respect to an automobile to which the insurance applies under paragraph 1(b) of the Automobile Hazards, any person while using such automobile with the permission of the person or organization to whom such automobile is furnished provided such person's actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission;'

The Fidelity policy afforded liability coverage in connection with the use by Loftus of a non-owned automobile. It provided, however:

"Other Insurance

If the Insured has other insurance against a loss covered by Part I of this policy the Company shall not be liable under this policy for a greater propor-tion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance."

The Ford, one of 16–20 demonstrators owned by Linden, was furnished Barnhart for his personal use but was available to others in the Linden organization for demonstration purposes. Demonstrators were also loaned to customers whose cars were being serviced. Linden did not "pool" its demonstrators but instead furnished certain officers and salesmen with a specific demonstrator which was to be made available for company purposes when needed. Under this arrangement a particular model demonstrator could be located with a minimum of delay. Also, responsibility for its condition was fixed. Demonstrators were ultimately sold under an "A" title. Undoubtedly, this arrangement had a sound business objective but, nevertheless, it permitted substantial personal use of the demonstrator. Neither Barnhart nor his wife owned an automobile. Linden assigned a demonstrator to each, which served as family cars subject to use by Linden.

Liberty contends that: the Ford was being used principally in "garage operations"; the hazards protected against and the persons insured fall under paragraph 1(a) of the Automobile Hazards section of its basic policy and paragraph 3(b) of the Persons Insured section of the endorsement, respectively; paragraph 3(b) of the endorsement specifically provides that persons such as Loftus are covered "only if no other valid and collectible automobile liability insurance, either primary or excess, \* \* \* is available to such person"; and that Loftus had insurance available under the Fidelity policy which was unaffected by the "Other Insurance" clause of that policy because there was no "other valid and collectible insurance" available to Loftus

in view of paragraph 3(b) of the Liberty policy. Fidelity contends that the Liberty policy covered Loftus under paragraphs 1(b) (i) of the Automobile Hazards section of the basic policy and paragraph (4) of the endorsement because these sections provide coverage to anyone using the automobile with the permission of a company officer *to whom the car had been furnished,* and that the question of the effect of the escape clause in the Liberty endorsement, which is only applicable to garage operation coverage under 1(a) of the Automobile Hazard section of the Liberty policy, does not arise. In the alternative, Fidelity contends that if the Ford was being used in garage operations so that there was only coverage pursuant to paragraph 1(a) of the basic Liberty policy and paragraph 3(b) of the endorsement, the "escape" clause in paragraph 3(b) is inconsistent with the "excess" clause in the Other Insurance provision of the Fidelity policy, and the excess clause must prevail.

■ If the Mustang had not been in for service at the time Loftus borrowed the Ford, and if there was evidence of extensive personal use of the Ford by Barnhart, Fidelity's contention that paragraph 1(b) (i) and paragraph 4 of the Liberty policy provided coverage aside from the "excess" provisions of paragraph 3(b), would be plausible. Paragraph 1(b) (i) of the Liberty policy provides coverage on automobiles owned by Linden while furnished for the use of an executive officer of the company or his spouse. Certainly the Ford was furnished for Barnhart's use. He could use it unless or until it was needed for company business. Liberty argues that the uncontradicted testimony shows that the Ford was not furnished exclusively for Barnhart's use, but there is nothing in paragraph 1(b) which requires that it be furnished for his exclusive use. Nor is it inconsistent that both paragraphs 1(a) and 1(b) could be applicable to the same vehicle, depending on the use made at a given time. The record does not show

the extent to which the Ford was used for business purposes. Since the testimony is uncontradicted that it was principally a demonstrator available at all times for demonstration or loan to customers, and since Loftus was a customer with a car in for service at the time of the accident, the Ford was in use in connection with garage operations, or at least its use amounted to a non-business use of a car used principally in garage operations, a hazard covered by paragraph 1(a) of the Liberty policy.

■ The matter then boils down to the excess clause in the "Other Insurance" paragraph of the Fidelity policy and the escape clause in paragraph 3(b) of the Liberty endorsement.[1] The parties have not suggested that the law of a jurisdiction other than Pennsylvania governs this action. If it were not for "either primary or excess" included in paragraph 3(b) of the Liberty endorsement, the law of Pennsylvania would not give effect to the escape clause on the theory that up to the amount of coverage of the Liberty policy, the Fidelity policy would not provide "other valid and collectible insurance." Cf. Grasberger v. Liebert & Obert, Inc., 1939, 335 Pa. 491, 6 A.2d 925; Continental Cas. Co. v. Curtis Pub. Co., 3 Cir. 1938, 94 F.2d 710; Carolina Cas. Ins. Co. v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co., 3 Cir. 1964, 327 F.2d 324. In 8 Appleman, Insurance § 4914, the reason for the rule is set out:

> "It has been held that where the owner of an automobile or truck has a policy with an omnibus clause, and the additional insured also has a non-ownership policy which provides that it shall only constitute excess coverage over and above any other valid, collectible insurance, the owner's insurer has the primary liability. In such case, the liability of the excess insurer does not arise until the limits of the collectible insurance under the primary policy have been exceeded. It should be noted that under this rule, the courts give no application to the other insurance

---

1. See Concurrent Coverage in Automobile Liability Insurance, 65 Columbia L.Rev. 319, 320–321.

■

clause in the primary policy, which provides that if the additional insured has other valid and collectible insurance, he shall not be covered by the primary policy. That is because the insurance under the excess coverage policy is not regarded as other collectible insurance, as it is not available to the insured until the primary policy has been exhausted. Or, to put it another way, a non-ownership clause, with an excess coverage provision, does not constitute other valid and collectible insurance within the meaning of a primary policy with an omnibus clause." (Footnotes omitted.)

No Pennsylvania appellate authority has been found which has construed the effect of an escape clause with "either primary or excess" vis-a-vis an excess clause. Fidelity suggests that "either primary or excess" has been added to the Liberty policy because some courts concluded an excess clause was more specific than an escape clause without it and accordingly held the policy with the escape clause was the primary coverage. In construing clauses in policies almost identical to the policies in this case, federal courts in Alabama and Illinois have held that the escape clause prevails over the excess clause. United States Fidelity & Guaranty Co. v. Dixie Auto Ins. Co., N.D.Ala.1968, 292 F.Supp. 554, aff'd per curiam 5 Cir. 1968, 403 F.2d 717; Indiana Lumbermens Mut. Ins. Co. v. Mitchell, E.D.Ill.1968, 285 F.Supp. 969, aff'd 7 Cir. 1969, 409 F.2d 392. In both cases there were no state authorities directly on point. The Dixie Auto case is particularly interesting since both the facts and the policy provisions are similar to those in the present case. Fidelity had issued a garage policy to Halls Motors with an escape clause identical to the Liberty escape clause. Halls Motors loaned a car to McMurrey and his wife to use pending completion of a sale in which the McMurreys had traded in their car. Dixie Auto Insurance Co. had issued a policy to the McMurreys which extended coverage while they were driving a car other than their own car and which included an excess clause practically identical to that in the Fidelity policy issued to Loftus. While using the Halls Motors car, the McMurreys were involved in an accident. The court reasoned that the Fidelity endorsement containing the escape clause "specific in nature and by its terms included 'primary or excess' insurance," and held that the escape clause prevailed over the Dixie excess clause. Thus, Fidelity vigorously opposes in the present case a contention it advanced successfully in the Dixie case. In the Indiana Lumbermens case, the court of appeals, in affirming the district court, reasoned (409 F.2d 394–395):

"Thus, each insurer has attempted to provide for liability only to the extent that 'other insurance' is not available. It is uncontested that if either policy had not existed the other would have provided coverage. The presence of both, however, necessitates the inquiry as to which, if either, of the 'other insurance' clauses is effective. The district court held that the Lumbermens policy 'never came to life' by virtue of its terms, and therefore Allstate must bear, within the monetary limits of its policy, the entire loss.

We agree.

\*  \*  \*  \*  \*  \*

" \* \* \* [I]n the instant case, the garage policy of Lumbermens specifically excluded coverage when there was other valid and collectible insurance, 'either primary or excess.' It is this specific inclusion of 'excess' insurance within the meaning of 'other valid and collectible insurance' which relieves Lumbermens of any obligation to defend or indemnify Bresnahan. We note the following cases which have reached the same result in dealing with almost identical factual situations: Allstate Insurance Company v. Shelby Mutual Insurance Company, 269 N.C. 341, 152 S.E.2d 436 (1967); Government Employees' Insurance Company v. Lumbermens Mutual Casualty Company, 269 N.C. 354, 152 S.E.2d 445

(1967); Faltersack v. Boogaard, 39 Wis.2d 64, 158 N.W.2d 322 (1968).

"This conclusion is bolstered by the fact that the portion of the Lumbermens policy containing the above language was included '[i]n consideration of the reduced rate of premium.' Such reduced rate and the policy changes effected thereby demonstrate that Matthews Chevrolet contracted not to furnish liability coverage for a customer while he was driving a loaned car when he had his own automobile liability insurance. As we recently said in Chicago Terminal Clearance v. St. Paul Fire and Marine Insurance Company, 407 F.2d 552, page 554 (7th Cir., 1969), 'Therefore, the conclusion we reach is not only dictated by the language of the contract but has a reasonable basis in fact.'"

Other jurisdictions are in agreement. Continental Casualty Co. v. Weekes, 1954, Fla., 74 So.2d 367; Allstate Ins. Co. v. Shelby Mutual Ins. Co., 1967, 269 N.C. 341, 152 S.E.2d 436; Government Emp. Ins. Co. v. Lumbermens Mut. Cas. Co., 1967, 269 N.C. 354, 152 S.E.2d 445; Government Emp. Ins. Co. v. Globe Indemnity Co., 1967, Ky., 415 S.W.2d 581; Faltersack v. Vanden Boogaard, 1968, 39 Wis.2d 64, 158 N.W.2d 322; Cook v. Strolle, 1968, 39 Wis.2d 715, 159 N.W. 2d 686; and, for a Pennsylvania lower court case see an unreported decision in Liberty Mut. Ins. Co. v. Allstate Ins. Co., Court of Common Pleas of Philadelphia County, C.P. No. 4, September Term 1967, No. 1225.

Other courts, when confronted with identical clauses, have held that the excess clause prevails over the escape clause. Federal Ins. Co. v. Prestemon, 1967, 278 Minn. 218, 153 N.W.2d 429; Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exchange, 1969, Tex., 437 S.W.2d 390; State Farm Mut. Automobile Ins. Co. v. Home Indemnity Ins. Co., 1970, 23 Ohio St.2d 45, 261 N.E.2d 128; Bituminous Cas. Corp. v. Andersen, 1969, 184 Neb. 670, 171 N.W.2d 175. The results in these cases have been based on either strict construction of the policies or a judicial determination of the intent of the parties as determined from policy risks and premium bases. In one federal case, applying Kansas law, it was ultimately held that the excess clause prevailed over the escape clause, but the court limited liability under the policy containing the escape clause to "the applicable minimum limit of liability for bodily injury or property damage specified in the financial responsibility law of the state in which the automobile is principally garaged." Employers Mut. Cas. Co. v. MFA Mutual Ins. Co., 10 Cir. 1967, 384 F.2d 111, on remand, D.Kan. 1967, 278 F.Supp. 326. The reasoning in these cases is typified by the Hardware Dealers case:

"Here, however, [dealer's insurer] strongly urges that the instant 'escape' clause is not general, but specific, and should be favored over the 'excess' provision * * *.

"We are constrained, however, to a determination supported by what we believe to be the better reasoning and authority. * * * In the circumstances here presented we are of the opinion that the 'excess' and 'escape' clauses of the two policies cannot be reconciled. * * * The fact that Hardware's specific 'escape' enumerates particular types of insurance, including the 'excess' insurance type, does not obviate the conflict. * * *

"We find Judge Tate's concurring opinion in State Farm Mutual Auto Ins. Co. v. Travelers Ins. Co., 184 So.2d 750 (La.App.1966) to be most persuasive. * * *

"Judge Tate recognized the hopelessness of any attempt to reconcile the various conflicting policy clauses where each company 'attempts to make its own liability category secondary to that of any other.'

"Judge Tate suggests what to our mind is the better approach of allocating the respective policy coverage in the light of the total policy insuring intent, as determined by the primary policy risks upon which each policy's

premiums are based and as determined by the primary function of each policy.

" 'In each instance this is primarily determined by the vehicle or vehicles of the accident-vehicle's owner, i. e., the named insured, and by the more foreseeable risks of insuring his actual or consented-to use of the vehicle or vehicles particularly insured. The policies are primarily (i. e., particularly or especially) issued to insure the maintenance, operation, or use of such specific vehicles by the owner or by others with his consent. The contemplated use of these vehicles, rather than of any non-owned vehicles incidentally or occasionally used, furnishes that most significant basis for the insurer's determination of the premium to be charged for the issuance of the policy * * * This is indeed the view of a strong majority of courts now whenever there is a conflict between "excess insurance" clauses under non-ownership coverage of a negligent driver's policy as against "other insurance" (whether excess, pro rata, or escape) clauses under the omnibus coverage of the vehicle-owner's policy.'

"Applying this reasoning to the instant case * * * the insurer of the accident-involved automobile would be the primary insurer and [its] escape clause would be deemed 'legally ineffective to exculpate it from the liability primarily insured by it.' Farmers, on the other hand, would be an excess insurer."

A third group of authorities hold that conflicting "excess" and "escape" clauses are to be disregarded as mutually repugnant and the loss is prorated according to the primary limits of liability on each policy, Rocky Mountain Fire & Cas. Co. v. Allstate Ins. Co., 1970, 13 Ariz. App. 31, 474 P.2d 38; Graves v. Traders & Gen. Ins. Co., 1968, 252 La. 709, 214 So.2d 116; United Services Auto. Ass'n v. Hartford Acc. & Indem. Co., 1967, Tenn., 414 S.W.2d 836, although in some cases the loss is prorated on the basis of premiums paid, Insurance Co. of Texas v.

Employers Liab. Assurance Corp., S.D. Cal.1958, 163 F.Supp. 143, or upon the maximum loss each insurer standing alone would incur in the particular incident. Cf. Ruan Transp. Corp. v. Truck Rentals, Inc., D.Colo.1968, 278 F.Supp. 692. Thus, if the liability incurred were within the maximum limits of either policy, each insurer would be responsible for one-half. The reason for disregarding both the "escape" and "excess" clauses is set forth in Rocky Mountain v. Allstate, supra:

" * * * the drafter of the Rocky Mountain policy attempted to overcome the case law against general escape clauses by making its escape clause specific. To do this he added the words 'whether primary, excess or contingent' in defining 'other valid and collectible insurance.'

"We do not believe that the added adjectives defining other insurance helps in the solution of this problem for two reasons. First, we cannot agree with the reasoning of the case law supporting the proposition that an excess clause prevails over an escape clause. This reasoning has been to regard the 'escape' policy as 'other valid and collectible insurance,' thus giving effect and recognition to the 'excess' policy, but refusing to recognize the validity of the 'excess' policy as 'other insurance' thereby giving effect to and requiring application of, the 'escape' clause. * * *

"Secondly, we do not believe the adjectives 'whether primary, excess or contingent' add anything to the all-inclusive word 'other.' Normally, the word 'other' without qualification means any other type of insurance whatsoever without limitation as to excess, primary or contingent. Moreover, to now hold that this specific language must prevail over the less specific language of the Allstate policy would only lead Allstate to redraft its 'other insurance' clause to out-specific the specific language of the Rocky Mountain policy. We assume this could be done by adding to the 'ex-

cess' clause the language 'excess insurance over any other collectible insurance whether primary, excess, escape or contingent.'

"Thus the duel of legal specificity would continue ad infinitum with the result that the insured would have neither policy 'available' to him and we devolve ourselves into a battle of semantics. Such a result would obviously be contrary to the Arizona Financial Responsibility Act as interpreted by Jenkins v. Mayflower Insurance Co., supra, and the implied acknowledgement of both insurers in this case that some coverage is available. To overcome this problem, and to give effect to both policies we hold that where the primary purpose of both insurance policies is to provide expanded coverage and secondarily to limit liability and exposure in the event other insurance is available we will give effect to that intent in an equitable manner by requiring both insurers to provide coverage on a pro rata basis."

■ There does not appear to be a majority or a minority view. It is the conclusion of this court that Pennsylvania appellate courts would hold that because of the inclusion of "either primary or excess" in the Liberty clause, the escape clause and the Fidelity excess clause are mutually repugnant, and should be disregarded, and that the loss should be prorated based upon the maximum loss which each insurer standing alone would incur in the particular incident. Ruan Transp. Corp. v. Truck Rentals, Inc., supra. Since the loss was within the limits of liability of both insurers, it should be evenly divided.[2]

An appropriate order will issue.

2. This approach necessarily rejects Fidelity's alternative argument that the Liberty escape clause is invalid as contrary to the Pennsylvania Motor Vehicle Safety Responsibility Act of 1959. Fidelity points to subsection (b) (2) of the Act, 75 P.S. § 1421(b) (2), which requires that a policy must cover not only the owner or named insured, but also anyone using the vehicle with the permission of the owner or named insured, and that the Liberty policy, in attempting to restrict the omnibus coverage, conflicts with this Act. The same argument could be made with respect to the Fidelity policy since 75 P.S. § 1421(c) requires that an operator's policy extend coverage during his operation of non-owned vehicles. Each policy has complied with the law in extending the required coverage. If either one of the two policies were involved alone, the statutory requirement would be satisfied. The financial responsibility act does not require all insurers to have primary liability; as between two insurers a policy clause that insurance is to be deemed excess should be given effect if other insurance exists to cover the loss. 8 Appleman, Insurance Law & Practice § 4914; cf. Continental Cas. Co. v. Transport Indemnity Co., 16 Wis.2d 189, 114 N.W.2d 137.