**NORTHERN STATES POWER COMPANY, Appellant,**

v.

**FIDELITY AND CASUALTY COMPANY OF NEW YORK, Defendant,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, as itself and as successor in interest to Mercury Insurance Company, et al., Respondent.**

No. C3–92–2363.

Court of Appeals of Minnesota.

Aug. 3, 1993.

242

Larry D. Espel, Greene Espel, Minneapolis, for appellant.

Charles E. Spevacek, Meagher & Geer, Minneapolis, for respondent.

Charles E. Lundberg, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, and Wiley, Rein & Fielding, Washington, DC, for amicus Ins. Environmental Litigation Ass'n.

Considered and decided by SCHUMACHER, P.J., and NORTON and PETERSON, JJ.

## OPINION

SCHUMACHER, Judge.

Northern States Power Company (NSP) appeals from the district court's grant of summary judgment, arguing that the policies of respondent St. Paul Fire and Marine Insurance Company (St. Paul) provide primary coverage and that St. Paul is therefore responsible for an allocable share of damages. By notice of review, St. Paul contends the district court incorrectly found that the "own property" exclusion does not preclude coverage and that preventive response costs constitute damages. We reverse and remand.

## FACTS

In the early 1900's, NSP operated a coal gas manufacturing plant in Faribault, Minnesota. In 1981, the Minnesota Pollution Control Agency (PCA) discovered contamination on the site. According to NSP's expert, there is contaminated groundwater, oil in the water table, oxide box waste contaminated soil, coal tar, and coal tar contaminated soil. The PCA and NSP entered into a consent order in 1988. Under the terms of the order, NSP is subject to continuing monitoring requirements. NSP contends that to date it has incurred $1,625,390.57 in response costs for investigatory and remedial actions. This includes $852,517.66 to outside vendors, $344,323.92 in internal costs, and $428,548.99 in interest.

To recover its costs, NSP sued 14 carriers that provided insurance to NSP from 1946 through 1985. NSP has settled with all carriers, except St. Paul, on terms analogous to *Pierrenger* settlements.

Five St. Paul policies are at issue. Their policy periods, policy limits, and self-insured retentions are as follows:

| Policy Period | Policy Limits | Self–Insured Retention |
|---|---|---|
| 10/01/58–01/01/62 | $5,000,000 | $ 25,000 |
| 01/01/62–07/01/63 | $5,000,000 | $ 25,000 |
| 07/01/63–01/01/67 | $5,000,000 | $ 25,000 |
| 01/01/67–01/01/70 | $5,000,000 | $ 25,000 |
| 01/01/70–01/15/73 | $5,000,000 | $100,000 |

The policies are essentially the same. All are labeled "EXCESS LIABILITY POLICY" and provide comprehensive general li-

ability coverage. The policies provide that St. Paul agrees to pay

> on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law * * * for damages because of injury to or destruction of tangible property, including the loss of use thereof.

There is an exclusion for "injury to or destruction of * * * property owned by the Insured."

> If the Insured's liability insured under this Policy is covered by any other valid and collectible insurance, then this policy shall act as excess insurance over and above such other insurance.

The policies further provide:

> The Insured or any company as his insurer shall pay the first $25,000 [or $100,000] for each occurrence or series of occurrences arising out of one event.

NSP moved for partial summary judgment. The district court found that NSP's damages resulted from injury to property, the damages resulted from a continuing occurrence during the terms of St. Paul's policies, the "own property" exclusion did not preclude coverage, and St. Paul was not prejudiced by late notice. However, the court denied NSP's motion on the ground that the "other insurance" provisions in St. Paul's policies converted them to policies in excess of all other policies. Therefore, St. Paul was an excess carrier and would not be responsible for response costs unless the costs exceeded the limits of the primary policies. The district court did not decide whether the losses were greater than the coverage provided by the settling carriers.

NSP and St. Paul then filed cross-motions for summary judgment. St. Paul argued that NSP's losses were less than the coverage available from the primary insurance policies. NSP argued that the district court erred in finding that St. Paul's policies were excess, that St. Paul had not established that there was other valid and collectible insurance that covered the same liability, and that the court should allocate NSP's damages on a policy limits basis. The district court granted St. Paul's motion for summary judgment. NSP appeals.

## ISSUES

1. Did the district court err in finding that St. Paul's policies provide excess insurance?

2. Did the district court err in finding, as a matter of law, that the claimed expenses are damages from injury to property?

3. Did the district court err in finding, as a matter of law, that the "own property" exclusion does not preclude coverage?

4. How should damages be allocated when using the actual injury trigger theory of coverage?

5. How should the self-insured retentions be treated when using the actual injury trigger theory of coverage?

## ANALYSIS

On appeal from summary judgment, this court must decide whether there are any genuine issues of material fact and whether the trial court correctly applied the law. *City of Va. v. Northland Office Properties*, 465 N.W.2d 424, 427 (Minn. App.1991), *pet. for rev. denied* (Minn. Apr. 18, 1991). Interpretation of an insurance contract is a question of law which this court reviews de novo. *Garrick v. Northland Ins. Co.*, 469 N.W.2d 709, 711 (Minn. 1991).

1. NSP contends that St. Paul was a primary carrier for the years 1958 through 1973 and is responsible for an allocable share of the response costs. St. Paul responds that the district court properly found that St. Paul was an excess carrier.

The district court compared the "other insurance" clauses of the St. Paul policies to the "other insurance" clauses in the settling carriers' policies. If there was other valid and collectible insurance covering the risk, St. Paul's policies were excess over *any* insurance that covered the liability, whereas the settling carriers' policies provided that they were excess over poli-

cies *other than excess policies*. The district court found that the clauses did not conflict and that St. Paul's policies became excess to all other policies covering the liability.

■ We disagree. The district court looked only at the type and language of the "other insurance" clauses. Minnesota courts have rejected this *Lamb–Weston*-type approach.[1] Minnesota evaluates coverage by examining the total policy insuring intent, as determined by the primary function of the policy and the primary policy risks upon which the premiums were based. *Integrity Mut. Ins. v. State Auto. & Casualty Underwriters Ins. Co.*, 307 Minn. 173, 175, 239 N.W.2d 445, 446 (1976); *see also Interstate Fire & Casualty v. Auto–Owners Ins. Co.*, 433 N.W.2d 82, 85 (Minn.1988); *Federal Ins. Co. v. Prestemon*, 278 Minn. 218, 231, 153 N.W.2d 429, 437 (1967); *but cf. Illinois Farmers Ins. Co. v. Depositors Ins. Co.*, 480 N.W.2d 657 (Minn.App.1992) (If "other insurance" clauses do not conflict, court need not undertake *Integrity* analysis.).

■ Here, we do not have overlapping coverage in the technical sense because the policies at issue have different policy periods. Minnesota courts, however, have applied this analysis even in the absence of "other insurance" clauses. *See Garrick*, 469 N.W.2d at 712 (lack of other insurance clause does not make policy primary; examine insuring intent of policy). We extend the use of this analysis in the present case to determine if St. Paul's policies are primary or excess.

■ Here, we use the broad *Integrity* approach as presented in *Richardson v. Ludwig*, 495 N.W.2d 869, 874–75 (Minn.

App.1993), *pet. for rev. denied* (Minn. Apr. 20, 1993), to analyze the intent of the St. Paul policies.[2]

(a) *Specific Description*: St. Paul's policies are labeled excess policies. Looking to the standard language of the policies, however, St. Paul clearly intended to provide NSP with comprehensive general liability coverage.

(b) *Premium*: It is unclear from the record what premiums were paid.

(c) *Primary/Incidental Coverage*: St. Paul, like the settling carriers, provided comprehensive general liability coverage. St. Paul's policies were intended to provide the first layer of coverage subject to NSP's self-insured retentions. In fact, from July 1, 1963 to December 31, 1972, NSP had another carrier provide excess insurance.

(d) *Other Relevant Factors*: Comparing "other insurance" clauses in policies providing coverage over different time periods may lead to inequitable results. It is unlikely that St. Paul and NSP intended that "other valid and collectible insurance" meant insurance provided by later acquired policies. It is unfair for a later carrier to provide for coverage damages it believed were covered by earlier policies. Umbrella policies provide a unique form of insurance because the premiums are small compared to the size of the risk. 8A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 4909.85 (1981). During the time period in question, it appears other carriers provided umbrella coverage to NSP. If St. Paul's policies become excess to all other carriers, the true umbrella carriers' exposure would increase without any compensation for the additional risk. Therefore, we hold that St. Paul's policies

---

1. The *Lamb–Weston* doctrine requires that the loss be prorated among the insurers on the basis of their policy limits when "other insurance" clauses conflict. *Lamb–Weston, Inc. v. Oregon Auto. Ins. Co.*, 219 Or. 110, 341 P.2d 110 (1959).

2. In *Auto–Owners Ins. Co. v. Northstar Mut. Ins. Co.*, 281 N.W.2d 700 (Minn.1979), a more specific test was presented:

(1) Which policy specifically described the accident-causing instrumentality? (2) Which premium is reflective of the greater contemplated exposure? (3) Does one policy contemplate the risk and use of the accident-causing instrumentality with greater specificity than the other policy—that is, is the coverage of the risk primary in one policy and incidental to the other?

provided primary coverage.[3]

■ The next question is whether coverage under the St. Paul policies was triggered. The district court found that there was one ongoing occurrence and that the actual injury was continually manifested during the St. Paul policy periods. Applying the actual damage trigger theory outlined in *Industrial Steel Container Co. v. Fireman's Fund Ins. Co.*, 399 N.W.2d 156, 159 (Minn.App.1987), *pet. for rev. denied* (Minn. Mar. 18, 1987), the policies were triggered because actual damage occurred during the policy periods. The parties have not contested these findings nor have they appealed the use of the actual damage trigger theory. We conclude, therefore, there is coverage under these policies unless one of the exclusions precludes coverage.

2. St. Paul contends that even if its policies are primary, it should not have to cover any expenses because NSP has not spent any money for "damages because of property damage." St. Paul argues that NSP has incurred no expenses for cleaning up the groundwater pollution. Instead, St. Paul asserts, NSP spent money to remedy aesthetic and site safety concerns. NSP responds that expenditures necessary to clean up contamination are "damages because of property damage" within the meaning of a comprehensive general liability policy and that all costs are reimbursable because property damage occurred. In addition, NSP contends that the measures were not "purely preventative," but were remedial efforts to restore the contaminated areas to a "clean" condition that would no longer damage the state's resources.

The district court found that any economic outlay mandated by the PCA would be covered under a comprehensive general liability policy, and only when actual property damage is absent would costs for preventative measures be excluded. The court then concluded that because there was property damage and NSP's expenses were mandated by the PCA, there was coverage under the St. Paul policies as a matter of law.

*Id.* at 704.

We disagree. In *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175 (Minn.1990), the supreme court held:

> Expenditures mandated by the Minnesota Pollution Control Agency pursuant to the Minnesota Environmental Response and Liability Act, Minn.Stat. ch. 115B, which are necessary to effectuate the cleanup of contamination which has already occurred to the state's water resources, are "damages because of * * * property damage" within the meaning of the comprehensive general liability insurance policies.

*Id.* at 184. "Purely preventative measures are not covered in the absence of property damage." *Id.* The supreme court left to the federal district court "the task of determining precisely which costs associated with the cleanup of the contaminated sites will be covered." *Id.*

■ We conclude that not all expenditures mandated by the PCA are necessarily covered under a general liability policy. Costs and expenses for the cleanup of pollution that is already present are covered. *See Aerojet–General Corp. v. Superior Ct. of San Mateo County*, 211 Cal.App.3d 216, 257 Cal.Rptr. 621, 635 (1989) (reaching this conclusion under CERCLA), *pet. for rev. denied*, (Cal. Aug. 10, 1989). Expenditures to prevent future pollution of a type which has yet to occur or from a source which has yet to cause pollution, however, are not covered because these costs are not causally related to the property damage. *Id.* The court in *Aerojet* illustrated these principles with the following hypothetical:

> Petitioners have two underground storage tanks for toxic waste. Tank # 1 has leaked wastes into the soil which have migrated to the groundwater or otherwise polluted the environment. Tank # 2 has not leaked, but government inspectors discover that it does not comply with regulatory requirements, and could eventually leak unless corrective measures

---

3. Under this analysis, we need not reach the issue of who has the burden of proving that there is other valid and collectible insurance.

are taken. Response costs associated with Tank #1 will be covered as damages, because pollution has occurred. Tank #2 would not be covered. Likewise, the expense of capital improvements to prevent pollution in an area of a facility where there is none, or improvements or safety paraphernalia required by government regulation and not causally related to property damage, would not be covered as "damages."

*Id.*

Here, both parties concede there is contamination to the groundwater. Mandated expenditures necessary to clean up the groundwater and the contaminated soil causing the groundwater pollution and other expenses causally related to remedying the groundwater pollution are covered. We remand these determinations to the district court.

3. Next, St. Paul contends that the insured's "own property" exception applies, precluding coverage. St. Paul argues that the contaminated property was owned by NSP during the time the damage occurred and that no money has been spent to remedy the contamination of the groundwater, but only to excavate and remove contaminated soil. NSP responds that the exclusion is inapplicable because the damages result from contamination to the groundwater, which is state property.

The district court found that groundwater contamination was injury to public property, not the property of the insured, and therefore, as a matter of law, the exclusion was inapplicable.

Whereas we agree with the district court's general statement of law, we find its results are overly broad under the facts of this case. In *Minnesota Mining*, the supreme court found "that pollution of the groundwater is damage to public property." *Minnesota Mining*, 457 N.W.2d at 182 (citing *Aerojet*, 257 Cal.Rptr. at 629). Hence, damage to groundwater is not "injury to or destruction of * * * property owned by the Insured," and thus costs incurred to correct the groundwater pollution are covered.

We further conclude that, because groundwater pollution has occurred, the "own property" exclusion does not bar coverage for cleanup expenses needed to correct already existing soil contamination which continues to damage the groundwater. *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1565 (9th Cir.1991) (applying California law, expenses incurred to remedy existing groundwater and third party property damage and to prevent further damage to that property from already introduced contaminants not barred by this exclusion); *United States v. Conservation Chemical Co.*, 653 F.Supp. 152, 200–01 (W.D.Mo.1986) (applying Missouri law, where groundwater contamination exists, abatement costs to prevent damage or further damage to third parties not excluded); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co. of N.Y.*, 218 N.J.Super. 516, 528 A.2d 76, 82–3 (App. Div.1987) (where continuing discharge of contaminants into stream, abatement costs to prevent continued contamination and damage to third parties not barred by exclusion). The primary concern here is to clean up and prevent further damage to public resources, not solely to remedy problems located on the insured's property. *Polkow v. Citizens Ins. Co. of Am.*, 180 Mich.App. 651, 447 N.W.2d 853, 857 (1989).

Mandated expenses remedying problems confined on NSP's property that do not rectify the groundwater and associated soil contamination, however, are precluded from coverage by this exclusion. *See Intel*, 952 F.2d at 1566 (exclusion bars coverage for expenses related to damage only to insured's property); *Conservation Chemical*, 653 F.Supp. at 200 (expenses for damages contained on insured's property unrelated to off-site contamination or prevention thereof precluded by exclusion); *Broadwell*, 528 A.2d at 82 (remedies for damage confined to insured's property precluded by "own property" exclusion). Whether mandated response costs fall within this exclusion is a question of fact. *Intel*, 952 F.2d at 1566; *Broadwell*, 528 A.2d at 83. We remand this issue for determination by the district court.

4. NSP argues that if St. Paul is a primary carrier, then all the carriers are concurrently liable and damages should be prorated according to the policy limits. St. Paul responds that the issue of damages should be remanded and that the district court should stack the policies according to the total policy insuring intent to allocate damages.

The allocation methods advanced by the parties are appropriate when insurers are liable for the same risk occurring over the same policy period. Here, however, one continuing injury occurred over different policy periods. Because Minnesota has not considered this question, we examine the case law of other jurisdictions.

■ NSP has presented this case under the actual injury trigger rule adopted by this court in *Industrial Steel*. *Id.* at 159. In *Industrial Steel*, we cited New York law in our adoption of the rule. *See id.* at 159 (citing *American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2d Cir.1984)). New York has devised a method to allocate damages under the actual injury trigger rule, and we adopt its allocation method as well. *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1391–1394 (E.D.N.Y.1988). *Uniroyal* adopts a proportional allocation, not according to the policy limits as NSP espouses, but in relation to the proportion of the injuries that happened during the policy period. *Id.* *Uniroyal* involved damage caused by Agent Orange. The court had no information on the loss attributable to the servicemen's injuries. Because the delivery of the substance resulted in the injuries, the court looked at the percentage of gallons of Agent Orange delivered to the military during each triggered policy period and allocated responsibility among the policies based on that percentage. *Id.* On remand, the district court should allocate damages based on the percentage of property damage that occurred when St. Paul provided coverage.

5. As for the self-insured retentions, NSP contends that because there has been only one "occurrence," NSP need pay only one prorated deductible. St. Paul responds that NSP, as a self-insurer, is responsible for the first layer of coverage and must pay all its retained limits before looking to the primary layer of coverage for payment.

■ We again adopt the *Uniroyal* approach. Self-insured retentions are treated as deductibles in this situation. *Id.* at 1371, 1393. In *Uniroyal*, the court found that there was only one occurrence, the delivery of the chemicals. *Id.* at 1379–87. The chemicals were delivered during two policy periods. The policies had a per occurrence deductible. The insured had to meet the deductible of each policy before invoking the coverage under that policy. Therefore, the insured had to pay two deductibles. *Id.* at 1394.

■ Here, the district court found that there was one ongoing occurrence. The St. Paul policies' retentions are on a per occurrence or event basis. We conclude, therefore, that NSP is required to pay one deductible for each policy under which it is invoking coverage.

## DECISION

The district court erred in granting St. Paul's motion for summary judgment. We reverse the finding that St. Paul was an excess carrier and hold that St. Paul provided primary coverage. We remand to the district court the remaining issues in accordance with this opinion.

**Reversed and remanded.**