DOMTAR, INC., Respondent (C0–95–2626; C7–95–2638), Appellant (C9–95–2673),

v.

NIAGARA FIRE INSURANCE COMPANY, et al., Appellants (C7–95–2638), Respondents (C0–95–2626; C9–95–2673),

Canadian General Insurance Company, et al., Respondents,

Certain Underwriters at Lloyd's of London et al., Appellants (C0–95–2626), Respondents (C7–95–2638; C9–95–2673).

Nos. C0–95–2626, C7–95–2638 and C9–95–2673.

Court of Appeals of Minnesota.

Aug. 6, 1996.

Review Granted Oct. 17, 1996.

Douglas L. Skor, Kathleen Erickson Di-Giorno, Paul C. Thissen, Briggs and Morgan, P.A., St. Paul, Paul Anton Zevnik, John L. Osborne, Zevnik, Horton, Guibord and Mc-Govern, P.C., Washington, DC, for respondent-appellant Domtar, Inc.

Thomas A. Person, Arthur, Chapman, Mc-Donough, Kettering & Smetak, P.A., Minneapolis, for appellants-respondents Niagara Fire Ins. Co. et al.

Larry Hanson, Chris Kabella, Moore, Costello & Hart, St. Paul, for respondents Canadian General Ins. Co. et al.

Thomas P. Kane, Kenneth H. Podpeskar, Oppenheimer Wolff & Donnellly, St. Paul, Gary W. Werterberg, Joseph A. Hinkhouse, Lord, Bissel & Brook, Chicago, IL, for appellants-respondents Lloyd's of London et al.

Charles E. Lundberg, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for amicus curiae Insurance Environmental Litigation Ass'n.

Laura A. Foggan, Elizabeth A. Eastwood, Treg A. Julander, Wiley, Rein & Fielding, Washington, DC, of counsel, for amicus curiae.

Considered and decided by KLAPHAKE, P.J., CRIPPEN and HUSPENI, JJ.

## OPINION

CRIPPEN, Judge.

The trial court held that three insurers (Lloyd's of London, Continental Insurance Company, and Niagara Fire Insurance Company) were liable to indemnify Domtar, Inc. for part of an environmental loss. The court also concluded that two of the insurers (Niagara and Continental) had a liability of $1.154 million for the cost of defending the underlying action by the Minnesota Pollution Control Agency and $1.664 million for expenses in this action. Domtar challenges the trial court's decision to allocate to Domtar the responsibility for damage to the site during the periods of time when Domtar evidently did not have insurance coverage. In separate appeals, now consolidated with Domtar's appeal, the insurers challenge the indemnity, defense, and costs and fees awards. We affirm.

## FACTS

1. Contamination.

From 1924 to 1929 and from 1934 to 1948, Domtar, previously known as Dominion Tar and Chemical Company, and its subsidiary, American Tar and Chemical Company, owned and operated a coal tar processing plant in Duluth, Minnesota. Domtar's operations were located on 11 acres of an industrial site encompassing approximately 230 acres of land and river bed.

Domtar's plant closed in 1948, and the property was sold in 1955. At that time, Domtar's equipment was disassembled and its tanks were demolished.

In August 1987, the Minnesota Pollution Control Agency (MPCA) initiated a remedial investigation of the 230–acre site. The MPCA determined that the area was polluted with coal tar and by-products. In 1991, the agency issued a Request for Response Action, naming Domtar as a responsible party for part of the site.

Initially, Domtar's liability was estimated at approximately $7 million for two units, known as the Tar Seeps Unit and the Soil Operable Unit, and $200–300 million for an-

other unit, known as the Sediments Operable Unit. The Sediments Operable Unit was not included in the 1991 action, and through the time of trial, no action request had been issued for the Sediments Operable Unit.

2. Insurance.

Between 1956 and 1970, Domtar purchased primary and excess liability coverage from several insurers, including Lloyd's, Niagara, and Continental. Niagara and Continental (referred to jointly as "Continental") insured Domtar under comprehensive general liability insurance policies in the amount of $5 million per policy period between 1965 and 1970. Lloyd's insured Domtar under excess liability policies between 1956 and 1965 and between 1966 and 1969. Domtar had insurance from another carrier, Canadian General, for the years between 1956 and 1965, and coverage under those policies is being disputed in another action. There is no evidence of insurance coverage for Domtar before 1956 or after 1970.

3. Insurers' liability for indemnification.

Domtar asked its 1956–1970 insurers to defend against the MPCA's request action, to investigate the site, and to pay for any clean-up costs. The insurers refused to defend or indemnify Domtar for the damage to the site. Domtar then commenced this declaratory judgment against the insurers.

A jury found that pollution property damage commenced in 1933 and that some damage took place while Domtar was insured by Continental and Lloyd's. The jury found that the insurers had failed to prove that no appreciable pollution property damage took place during the policy periods. Finally, the jury found that the insurers failed to prove that Domtar had acted or had failed to act with the intent to cause injury to property.

The trial court concluded that the insurers were liable to indemnify Domtar for the costs to clean up the site. But the court determined that the clean-up costs should be allocated by dividing the remediation costs by the number of years between 1933 and the year that clean-up begins. The effect of this method was to hold Domtar itself liable for

damages allocated to the years between 1933 and 1956, and after 1970.

4. Insurers' liability for costs and fees.

The trial court awarded Domtar approximately $1.683 million for its fees and costs incurred in this action to determine the insurers' defense and indemnification obligations. The court later reduced that award by the amount of Domtar's pre-tender expenditures, approximately $20 thousand.

The court also awarded Domtar approximately $1.154 million for its fees and costs incurred in defending the underlying MPCA action. The court did not reduce this award by the amount of Domtar's pre-tender expenditures.

ISSUES

1. Could the court lawfully allocate liability for pollution property damage to Domtar for damage during periods of time when Domtar could not establish coverage?

2. Did the trial court err by holding the insurers liable for appreciable pollution property damage during the policy periods?

3. Was it error to refuse to hold that principles of known loss and fortuity precluded coverage for pollution damage to the site?

4. Does the law permit the conclusion that Domtar's expenses for investigation and oversight by the MPCA constituted part of its defense costs?

5. Did the court err by refusing to reduce Domtar's cost-of-defense award by pre-tender costs incurred in defending the MPCA action?

ANALYSIS

*1. Allocation of liability to Domtar.*

■ By allocating losses proportionally over the years between 1933 and the date the site clean-up began, the trial court found indemnity coverage for only those sums allocated to years that Domtar was insured. This method of allocation left Domtar uncovered for clean up costs attributed to the

years 1933 to 1956 and after 1970, when Domtar had no recoverable insurance.[1]

This "pro rata by time on the risk" method of allocation was approved by the supreme court in *Northern States Power Co. v. Fidelity and Cas. Co.*, 523 N.W.2d 657 (Minn.1994) (hereinafter *NSP*). In environmental contamination cases, where damages have occurred over multiple policy periods,

> the trial court should presume that the damages were continuous from the point of the first damage to the point of discovery or cleanup.

> \* \* \* \* \* \*

> [C]ontamination of the groundwater should be regarded as a continuous process in which the property damage is evenly distributed * * *.

*Id.* at 664.

The *NSP* court dealt directly with apportionment among insurers and did not specifically address the question of whether damages should be allocated on a pro rata basis for periods when there was no insurance. But the court stated that the "pro rata time on the risk" method of allocating damages is consistent with the "actual injury" theory of coverage approved by the court, because "each policy would cover only those damages that are allocable to harm which occurred during the policy period." *Id.* at 662.

The *NSP* court also stated that damages should be distributed from the initial point of contamination to the end of the last covered period "or" to the end of the last "self-insured" period. *Id.* at 664.

Furthermore, when adopting the "pro rata time on the risk" method of allocating damages, the *NSP* court cited with approval two cases where other courts that used this method had prorated liability to the insured for periods of time it was uninsured. *Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980);

*Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71 (E.D.Mich.1987).[2]

The trial court properly construed *NSP* to require that damages should be allocated from the point of initial contamination until the date of clean-up, including the period of time when Domtar was not insured.

Domtar's policies with Continental and Lloyd's obligated the insurers to pay "all sums which the insured becomes legally obligated to pay as damages because of property damage." Domtar claims that this "all sums" language required that the total damages be allocated to the insurers, with no exposure left for Domtar. In support of this argument, Domtar cites *SCSC Corp. v. Allied Mut. Ins. Co.*, 515 N.W.2d 588 (Minn.App. 1994), where the court stated that the policies did not require the insured to share pro rata in the indemnification obligation. *Id.* at 601. But in *SCSC* there was only one isolated, identifiable release of contamination, which occurred during a period of insurance coverage. In this case, some of the loss occurred before the purchase of coverage from Continental or Lloyd's, and damages must be allocated to the years when the losses were suffered. In such a case, the distribution of liability is governed by *NSP*, not *SCSC*.

Domtar cites *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993), for the proposition that it should be allowed to collect the entire amount of damages from any insurer whose coverage has been triggered. But *J.H. France* employed a method of allocation that assigns to an insurer the responsibility for damage that has occurred outside the policy period, a method that contradicts principles of the "pro rata time on the risk" method adopted in *NSP*. *See* William R. Hickman & Mary R. DeYoung, *Allocation of Environmental Cleanup Liability Between Successive Insurers* 17 N.Ky.L.Rev. 291 (1990) (comparing

---

1. Domtar points out that the jury did not determine that there were any damages after 1970. But the undisputed evidence indicates that there was damage to the soil and groundwater after 1970.

2. Both cases assigned such liability only for defense costs; however, a similar result would appear to be applicable for indemnity costs. William R. Hickman & Mary R. DeYoung, *Allocation of Environmental Cleanup Liability Between Successive Insurers*, 17 N.Ky. L.Rev. 291, 307 (1990).

different methods of allocating liability for environmental clean-up damages).

In sum, by reason of the *NSP* holding, the insurers do not have responsibility for parts of continuous damage that occurred outside their policy periods. 523 N.W.2d at 662. The trial court did not err by allocating to Domtar those damages for the years in which no coverage was shown.

## 2. Liability for appreciable property damage during policy periods.

### a. "Accidents" during policy periods.

■ Domtar's policies with Lloyd's between 1956 and 1962 provided that Lloyd's would indemnify Domtar for property damage caused by "accidents" during the policy periods. Lloyd's claims that the only "accidents" consisted of spills during the life of the plant and at the time the plant was decommissioned, before Lloyd's began issuing its policies to Domtar in 1956, and that its liability does not arise even if the spills resulted in property damage during the policy periods.

Under Minnesota law, the triggering event for insurance coverage is "the actual damage, such as contamination of groundwater or soil during a policy period." *Fairview Hosp. & Health Care Servs. v. St. Paul Fire & Marine Ins. Co.*, 518 N.W.2d 41, 44 (Minn.App. 1994), *aff'd* 535 N.W.2d 337, 341 (Minn.1995); *see also, Industrial Steel Container Co. v. Fireman's Fund Ins. Co.*, 399 N.W.2d 156, 159 (Minn.App.1987), *review denied* (Minn. Mar. 18, 1987). "To establish coverage under a particular policy, an insured must demonstrate that damage 'occurred' while the policy was in effect." *NSP*, 523 N.W.2d at 659 n. 3 (quoting Hickman & De Young, *supra*, at 293). Adoption of Lloyds' argument that the "accident" occurred before the damage to the groundwater and soil took place would require us to adopt an "exposure" rule, rather than the "actual injury" rule approved by our supreme court.

### b. "Appreciable" property damage.

■ Where damages have occurred over multiple policy periods, a court should presume that the damages were continuous, and

a party who contends that no "appreciable damage" occurred during a certain period of coverage has the burden of proving that fact. *NSP*, 523 N.W.2d at 664.

■ Lloyd's argues that no appreciable property damage occurred during its policy periods. In the context of time periods, that which is appreciable has been contrasted with that which is merely temporary or momentary. *See Ford v. Stevens*, 280 Minn. 16, 19, 157 N.W.2d 510, 513 (1968) (holding that taxi cab did not "park" for an appreciable length of time when it merely stopped to let out passengers). But the term "appreciable" more generally refers to something capable of being perceived, weighed, measured, or appraised. *Kantor v. McKinley*, 9 Ohio App.2d 243, 224 N.E.2d 141, 143 (1966); *Medina v. McAllister*, 202 So.2d 755, 758 (Fla.1967); *Noland v. Wootan*, 102 Ariz. 192, 427 P.2d 143, 145 (1967). In the context of the *NSP* analysis, it is evident that the supreme court intended this widely accepted definition and did not intend that the term "appreciable" be the equivalent of "substantial."

■ We may set aside an answer to a special verdict question "only if no reasonable mind could find as did the jury." *Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984). Applying this standard, we decline to set aside the jury's finding that Lloyd's did not prove by a preponderance of the evidence that no appreciable property damage occurred during its policy periods. William Gregg, a geologist, testified that during the policy periods, the property damage at the site continued and expanded as chemical compounds migrated deeper into the soil and groundwater. John Erdman, an environmental engineer, testified that the contamination was moving deeper into the soil as an ongoing process. Dr. Charles Fetter, a geology professor, admitted that there were coal tar derived materials in contact with the groundwater and that the coal tar derived materials had been continuously dissolving since 1933. Moreover, Fetter testified that the damage was indivisible and that there was no way to tell what damage was the result of what events.

### c. Owned property exclusions.

■ The policies of both appellant insurers, Lloyd's and Continental, excluded coverage for injury to property owned by Domtar itself. Based on a broad view of public resources, the trial court held that these "owned property" exclusions were not applicable.

■ Contamination resulting in damage to an insured's own land may be excluded from coverage until the contaminants reach the groundwater, "which is the property of a third party, the state." *Krawczewski v. Western Cas. & Sur. Co.*, 506 N.W.2d 656, 659 (Minn.App.1993), *review denied* (Minn. Nov. 23, 1993). Expenses that must be incurred to remedy contamination to an insured's own property but are not also necessary to repair groundwater and associated soil contamination are precluded from coverage by the owned property exclusion. *Northern States Power Co. v. Fidelity & Cas. Co.*, 504 N.W.2d 240, 246 (Minn.App.1993) (hereinafter *NSP2); SCSC*, 515 N.W.2d at 599.[3] The insurers argue that the jury should have been allowed to determine how much of the site was actually contributing to groundwater contamination. *See NSP2*, 504 N.W.2d at 246 (characterizing as question of fact the determination of whether costs fall within the owned property exclusion).

The insurers were not entitled to application of their owned property exclusions in the circumstances of this case. These appellants have not addressed the fact that at the time Domtar purchased the policies, it had already sold the property. Therefore, when the injury to the property occurred during the policy periods, that injury did not occur to Domtar's "owned" property. *See Hatco Corp. v. W.R. Grace & Co.-Conn.*, 801 F.Supp. 1334, 1359 (D.N.J.1992) (stating that because insurers may, and routinely do, include alienated premises clauses in their policies, the reasonable expectations of a party to a contract that does not contain such a clause is that an owned property exclusion does not bar coverage for damage to alienated property).

### 3. Other defenses: known loss, expected or intentional harm.

#### a. Known loss or lack of fortuity.

■ Domtar purchased its policies from Continental and Lloyd's after Domtar had sold its plant in 1955. The insurers and amicus argue that at the time Domtar purchased the policies the contamination at the site was a "known loss" and was not "fortuitous" and that the trial court erred by failing to instruct the jury on these affirmative defenses.

■ The known-loss doctrine is a fundamental principle of insurance law, rooted in the prevention of fraud. *Astro Pak Corp. v. Fireman's Fund Ins. Co.*, 284 N.J.Super. 491, 665 A.2d 1113, 1116 (1995). Just as a liability policy typically states coverage for only an "accident" or "occurrence" during the term of the policy, the courts limit coverage, without additional policy language, by requiring that the claimed loss must be "accidental" or fortuitous, not one that is already known to the insured when the coverage is purchased.

■ Continental's separate fortuity arguments are merely a part of its case on the known-loss defense. An occurrence is fortuitous if the outcome of the event is not known in advance by the insured. *Bituminous Cas. Corp. v. Bartlett*, 307 Minn. 72, 78 n. 8, 240 N.W.2d 310, 313 n. 8 (1976) (citing Herbert S. Denenberg, et. al, *Risk and Insurance* 146), *overruled on other grounds, Prahm v. Rupp Constr. Co.* 277 N.W.2d 389, 391 (Minn. 1979). In Denenberg's words: "One cannot insure against a certainty." *Id.*

■ The insurers had the burden of proving their affirmative defenses of known risk and fortuity. *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 314 (Minn.1995)

---

**3.** As Domtar points out, a property owner is liable to the state for damage to natural resources, including soil. Minn.Stat. § 115B.04, subd. 1(c) (1994) (stating that property owner is liable for damage to natural resources); § 115B.02, subd. 10 (referring to § 116B.02,

subd. 4 for definition of "natural resources"); § 116B.02, subd. 4 (1994) (defining "natural resources" as including soil and water). But a property owner's liability for damage and an insurer's liability for that damage are separate issues.

(stating that insurer has burden of proving affirmative defense).

There is no doubt in this case that Domtar purchased insurance with the knowledge that it had engaged in conduct that posed a risk of future liabilities. But resolution of the legal issue requires that we determine what constitutes a "known loss," and knowledge of potential liability for groundwater contamination does not have the same legal significance as knowledge that an insurable loss has occurred. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1212 (1992) (question is not whether insured knew it was discharging a pollutant into the environment, but whether insured knew or should have known that a loss or liability would occur as a result of its actions).

In *Astro Pak,* an insured purchased insurance after selling contaminated property. The court rejected application of the known-loss doctrine, reasoning:

> [T]he "loss" must relate to a known occurrence that would trigger indemnification by the insurer. Only if plaintiff knew that its acts had already subjected it to potential liability because of leakage into the surrounding land, water or air, would the insurers have a claim to a defense.
>
> \* \* \* \* \* \*
>
> The fact that [the insured] was aware that [the landfill] was closed due to possible contamination [when the policies were written] does not equate with [the insured's] actual or constructive knowledge of an insured claim against [the insured].

*Astro Pak,* 665 A.2d at 1116–17. In sum, application of the doctrine requires attention to evidence that the insured knew of the insurable loss, not that it knew of the acts leading to that loss. *See IMCERA Group, Inc. v. Liberty Mut. Ins. Co.,* 42 Cal.App.4th 1754, 50 Cal.Rptr.2d 583, 597–98 (1996) (stating that known-loss doctrine was not applicable even if insured knew about pollution when it purchased insurance policies, where insured's liability for that pollution remained contingent), *review granted,* 54 Cal.Rptr.2d 41, 917 P.2d 1164 (Cal.1996). Just as Minnesota law recognizes that an accident occurs

when damage is done, a loss is accidental when insurance is purchased before the insured knows that a loss has occurred. Because no evidence in this case suggests that Domtar knew of its loss when it purchased its policies, there was no factual basis for application of the doctrine and the trial court did not err by refusing to instruct the jury on known losses.

b. Misrepresentation.

■ The trial court also refused to submit to the jury the insurers' claim that Domtar misrepresented the conditions at the site when it obtained insurance coverage. The court cited *Waseca Mut. Ins. Co. v. Noska,* 331 N.W.2d 917 (Minn.1983), which addressed claims that the insured had made misrepresentations or committed fraud. As in *Waseca,* there is no evidence of any misrepresentation by Domtar at the time it purchased its policies from Lloyd's and Continental. In fact, there is no evidence of any discussions between Domtar and the insurers at the time the policies were issued.

Continental cites the following statute:

> No oral or written misrepresentation made by the assured, or in the assured's behalf, in the negotiation of insurance, shall be deemed material, or defeat or avoid the policy, or prevent its attaching, unless made with intent to deceive and defraud, or unless the matter misrepresented increases the risk of loss.

Minn.Stat. § 60.85 (1961), *repealed* 1967 Minn. Laws, ch. 395 art. 1 § 25; *re-enacted as* Minn.Stat. § 60A.08, subd. 9 (1994). "Oral or written misrepresentations" are the expressly limited subject of this statute. Continental presented no evidence of oral or written representations that were made when the policies were issued.

c. "Unexpected" property damage.

■ Lloyds' policies from 1966 to 1969 provided coverage for accidents that "unexpectedly and unintentionally" resulted in property damage during the policy period. Lloyd's argues that the property damage was not "unexpected" because Domtar knew or had reason to know that its operations were polluting the environment.

Lloyd's cites evidence that neighbors complained about the smoke from Domtar's operations and that Domtar eventually bought them out and removed the houses. This evidence does not demonstrate that Domtar had reason to know that its operations would result in soil or groundwater damage. Moreover, the only testimony regarding Domtar's expectations or intent was submitted by Eli Skorich, a former Domtar employee. Skorich specifically testified that he did not expect or intend to hurt anyone or anything during his employment.

 Lloyd's contends, more generally, that a loss is expected where the evidence shows that the insured conducted a business that could be harmful to the environment. The defect in this argument is like the shortcoming of Lloyds' position on the accident and known loss issues, where the insurer failed to distinguish potential liability from actual losses. Here again, the insurer is dealing with evidence that losses were finally suffered but cites no evidence that the insured expected that this would happen or even that there was a substantial probability it would occur. *See Independent Sch. Dist. No. 197 v. Accident & Cas. Ins.*, 525 N.W.2d 600, 605 (Minn.App.1995) (articulating objective standard to determine whether damage is expected); *cf. Johnson v. AID Ins. Co. of Des Moines*, 287 N.W.2d 663, 665 (Minn. 1980) (involving repetition of behavior already shown to cause damage).

### d. Intentional harm exclusion.

 Continental's policies excluded coverage for "any act or omission committed with intent to cause injury to persons or property * * * ." These insurers argues that the trial court erred by refusing to instruct the jury that "every person is presumed to intend the usual consequences of his own conduct." Absent the trial court's abuse of its discretion, we will not reverse a decision regarding jury instructions. *Manderfeld v. Krovitz*, 539 N.W.2d 802, 809 (Minn.App. 1995), *review denied* (Minn. Jan. 25, 1996).

In the context of an "expected or intended" exclusion in a homeowner's insurance policy, the supreme court has rejected a jury instruction that "one is charged with intending the natural and probable consequences of his willful acts." *Continental W. Ins. Co. v. Toal*, 309 Minn. 169, 172, 244 N.W.2d 121, 123 (1976). The court reasoned that upon application of the disputed instruction, it would be immaterial whether the insured actually intended an injury, if the injury were a natural and probable consequence of an intentional act. In the insurance context, "intent" requires that the insured intend the harm itself. *Id.* at 175, 244 N.W.2d at 124.

> Thus the presumption in tort and criminal law that a person intends the natural and probable consequences of his intentional acts has no application to the interpretation of terms used in insurance contracts.

*Id.* at 175, 244 N.W.2d at 125. The trial court did not abuse its discretion by refusing the requested instruction.

### 4. *Insurers' additional indemnity issues.*

The insurers raise additional arguments to support their claim that the trial court erred by requiring the insurers to indemnify Domtar for costs to clean up the site. These arguments require brief attention.

### a. Automatic premium adjustment rating plan endorsement.

Continental's Automatic Premium Adjustment Rating Plan Endorsement provided for three computations of a retrospective premium after termination of the policy. The computations involved determining the insurer's "incurred losses" as defined by the endorsement.

 Because there was no evidence offered regarding the parties' intent when drafting the endorsement, we review the endorsement independently, as a matter of law. *See Bituminous Cas. Corp. v. Swartout*, 270 Minn. 216, 217, 133 N.W.2d 32, 34 (1965) (stating that because the facts surrounding a retrospective premium endorsement were undisputed, the interpretation of its provisions was a question of law). The language of the endorsement itself requires a retroactive adjustment only within five years after the termination of the policy, for situations where incurred losses were known and con-

templated by the parties at the time of the policy's termination.

The premium adjustment endorsement does not affect coverage, as Continental argues, and its adjustment process is not applicable for the losses here, which were reported long after the policy terms expired. *See id.* at 222, 133 N.W.2d at 36 (construing premium adjustment endorsement to avoid consequences that would have been drastic to the insured).

b. Primary liability under missing policies.

 Canadian General was Domtar's primary insurer from October 1956 to February 1965. The actual Canadian General policies were lost for periods during that time. Although Lloyd's did not otherwise dispute the existence or language of the lost policies, it was Lloyds' position that the policies could have contained additional endorsements. *See id.* at 219, 133 N.W.2d at 35 (recognizing that endorsement would prevail if inconsistent with policy provisions). Lloyd's argues that if Domtar has not complied with the terms of the missing endorsements, then Lloyd's is not liable under its excess policies.

Language in Lloyds' policies permits it to demand the existence of primary coverage. But it was undisputed that the actual Canadian General policies and any alleged endorsements were lost. Domtar apparently presented all the evidence that was available to establish the terms of the lost policies, and Lloyd's had the burden to prove that it was not liable due to some exclusion of coverage in the lost Canadian General policies or endorsements. *See Anderson v. Connecticut Fire Ins. Co.* 231 Minn. 469, 478, 43 N.W.2d 807, 814 (1950) (insurer has burden of proving facts to establish avoidance or reduction of liability). Lloyd's did not meet its burden of proof.

c. Testimony regarding interpretation of policies.

 The insurers claim that the trial court erred by allowing Domtar to solicit opinion testimony by its expert, Robert Hughes, about his interpretation of the policies.

The court submitted to the jury the issue of whether Continental breached the duty to defend Domtar. Before the jury could determine this issue, it was required to determine whether the policies arguably covered the MPCA's action against Domtar. *See Economy Fire & Cas. Co. v. Iverson,* 445 N.W.2d 824, 826 (Minn.1989) (stating that "insurer must defend where any part of the claim is arguably within the scope of policy coverage"). Because the duty to defend necessarily called for deciding whether there was arguable coverage under the policies, Hughes could properly testify that he believed there was coverage under the policies. *See* Minn. R. Evid. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.").

 It is especially significant that Hughes testified about the meaning of certain policy provisions and that this involved issues of law that the trial court properly decided without submitting them to the jury. *See St. Paul Fire & Marine Ins. Co. v. Lenzmeier,* 309 Minn. 134, 138, 243 N.W.2d 153, 156 (1976) (stating that, absent disputed parol evidence concerning the parties' intentions when drafting the insurance contract, interpretation of contract is question of law for the court, so that submission to the jury would not be appropriate). Because the trial judge decided the issues, we conclude that the admission of Hughes' testimony, if erroneous, constituted harmless error. *See In re Welfare of D.L.,* 486 N.W.2d 375, 381 (Minn. 1992) (concluding that although testimony was inadmissible, claim of error was moot because subject of testimony was not employed for court's decision); *see* 11 Peter N. Thompson, *Minnesota Practice* § 704.01 (1992) (stating that if the foundation for the expert's testimony is fully developed, "there may be little harm in the witness stating an ultimate conclusion that involves a legal standard"). Furthermore, the insurers' final arguments concerning Hughes's testimony were sufficient to remove any prejudice resulting from that testimony.

d. Limitation of undisclosed expert testimony.

▮ Lloyd's attempted to elicit testimony from one of its underwriters, Peter Lowsley-Williams, regarding the meaning and usage of Lloyds' insurance policies, and the claimed lack of coverage. Domtar objected to this testimony, arguing that Lowsley–Williams had not been disclosed as an expert witness and that he did not have any personal knowledge of the disputed policies.

The trial court was within its discretion in sustaining Domtar's objections and limiting Lowsley–Williams' testimony. *See Dennie v. Metropolitan Med. Ctr.* 387 N.W.2d 401, 407 (Minn.1986) (applying abuse of discretion standard of review). Because Lowsley–Williams was not identified as an expert, Domtar had been unable to depose him in that capacity. There is no showing that a continuance or other remedy would have been appropriate under the circumstances.

Lloyd's argues that because Lowsley–Williams was a defendant, he was not required to be disclosed as an expert. Lloyd's cites *Baran v. Presbyterian Univ. Hosp.,* 102 F.R.D. 272, 273 (W.D.Pa.1984), where the court concluded that under the federal rules, submission of expert reports was not necessary where the expert was also a party defendant.

The present situation is distinguishable because Lowsley–Williams was not a *Baran* defendant, that is, an "actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit." *Id.* Lowsley–Williams did not join the syndicate responsible for the Lloyd's policies until 1966, and admitted that between 1957 and 1965, he had no involvement with the policies at issue. The witness admitted in his deposition that he had no particular recollection of Domtar's policies.

▮ Lloyd's also attempted to solicit testimony by Martin Watson, an account manager for Lloyd's, and Edward Cheshire, a claims manager for a Lloyd's syndicate, regarding their reasons for believing that Lloyds' policies did not cover the damages at the Domtar site. Domtar objected to this testimony on the basis that Lloyd's had not previously identified Watson and Cheshire as expert witnesses. The trial court limited the testimony in accordance with Domtar's objection.

Lloyd's argues that Watson and Cheshire would have testified about their reasons for denying Domtar's claim, which would not have been "expert" testimony. *See* Minn. R. Evid. 702 (referring to expert testimony as regarding "scientific, technical, or other specialized knowledge"). But the evidence reveals that neither Watson nor Cheshire had personal knowledge permitting them to testify why Domtar's claim was denied.

e. Exclusion of documents.

▮ During his opening statement, Lloyds' attorney referred to two lawsuits against Domtar in 1925 and 1933 by neighbors Tasky and Fajdetich. The court ruled that the affidavits attached to the Tasky complaint were not admissible under the "ancient documents" exception to hearsay because the court had reason to suspect the authenticity of the documents.[4]

Lloyd's argues that the documents do not constitute hearsay because they were not offered to prove the truth of the matter asserted; rather, they were offered to prove Domtar's knowledge of the complaints. *See* Minn. R. Evid. 801(c) (defining "hearsay" as "a statement * * * offered in evidence to prove the truth of the matter asserted"). But the record reveals that Lloyd's attempted to admit the documents to prove that Domtar discharged poisonous and noxious gases from its plant. It is evident that Lloyd's was attempting to admit the documents to prove the truth of the matter asserted.

---

4. Domtar's attorney also objected to the admission of certified copies of the complaints, and the court sustained the objection. The court ruled that the complaints themselves were inadmissible as certified copies of court papers because the results of the litigation were unknown. Lloyd's has not objected to this ruling on appeal or addressed it in its briefs. *See In re Bieganowski,* 520 N.W.2d 525, 529 (Minn.App.1994) ("Generally, when an issue is not argued in the briefs it is deemed waived."), *review denied* (Minn. Oct. 27, 1994).

Under the "ancient documents" exception to hearsay, a party may admit "[s]tatements in a document in existence twenty years or more the authenticity of which is established." Minn. R. Evid. 803(16). The Comment to the rule states: "If the court has reason to suspect the trustworthiness of the ancient document, it may exercise its discretion under Rule 403 to exclude the evidence." In this case, the trial court exercised this discretion regarding the affidavits appended to the Tasky complaint. The court found that the affidavits were suspect because they appeared to have been written, signed, and notarized by the attorney for the plaintiffs. We will not disturb the trial court's decision regarding the admission of this evidence because the decision was not based on an erroneous view of the law and did not constitute an abuse of discretion. *Uselman v. Uselman,* 464 N.W.2d 130, 138 (Minn.1990).

### 5. Indemnity versus defense costs; costs unrelated to request for action.

The jury found that Continental owed Domtar approximately $1.154 million to defend against the MPCA action. Continental claims that some of this insurance obligation should be treated as a reduction of its total indemnity coverage and not as defense costs. *See Nordby v. Atlantic Mut. Ins. Co.,* 329 N.W.2d 820, 824 (Minn.1983) (stating that duty to defend is separate and distinct from duty to indemnify). The disputed costs included those for engineering consultation and risk assessment required to investigate the site and those for oversight activities by the U.S. Environmental Protection Agency and the MPCA. It is undisputed that all of these costs were necessary to comply with the MPCA's request for action, but Continental does not agree with Domtar's contention that this could be characterized as defending against the MPCA action.[5]

Continental claims that all costs to investigate and study the site should be considered indemnity costs because the purpose of the investigation was to engineer and effectuate a remedy and because these costs would have been incurred even if Domtar had not "defended" against the MPCA's action.[6]

The supreme court has held that expenditures mandated by the MPCA that are necessary to clean up contamination are "damages because of * * * property damage." *Minnesota Mining & Mfg. Co. v. Traveler's Indem. Co.,* 457 N.W.2d 175, 184 (Minn.1990); *SCSC,* 536 N.W.2d at 313. But in neither *Nordby* nor *Minnesota Mining* was the court asked to determine whether any initial investigation and oversight costs might be classified as defense costs rather than part of indemnity coverage.

The courts in several other jurisdictions have considered this issue, without arriving at any clear consensus. We hold that investigative and oversight costs mandated by an agency request for action should be presumed to be indemnity costs but may be shown to be defense costs where, as demonstrated here, the insurer has refused to defend and the expenses are incurred to avoid more onerous demands and not alone to comply with regulatory demands. *See generally General Accident Ins. Co. of America v. New Jersey Dep't of Environmental Protection,* 143 N.J. 462, 672 A.2d 1154 (1996) (concluding that costs of remedial investigation or feasibility studies mandated by the govern-

---

5. In its reply brief, Continental also objects to the attorney fees incurred by Domtar in responding to the MPCA request for action. This issue was not raised in Continental's initial brief. *See* Minn. R. Civ.App. P. 128.02, subd. 3 (limiting reply brief to issues raised in respondent's brief); *Reserve Life Ins. Co. v. Commissioner of Commerce,* 402 N.W.2d 631, 634 (Minn.App.1987) (granting motion to strike based, in part, upon fact that appellant raised new issues in reply brief), *review denied* (Minn. May 20, 1987).

6. It is noted that Continental has cited no specific evidence to support its claim that the costs should be considered indemnity expenses, de-

spite the fact that on appeal Continental has the burden of proving error by the trial court. *See Luebke v. J.I. Case Threshing Mach. Co.,* 178 Minn. 40, 46, 226 N.W. 415, 417 (1929) (stating that failure to cite specific location in record to support factual allegations was a flagrant violation of rule requiring such citations); *Hecker v. Hecker,* 543 N.W.2d 678, 681–82 n. 2 (Minn.App. 1996) (citing Minn. R. Civ.App. P. 128.02, subd. 2; 128.03, and noting that "material assertions of fact in a brief properly are to be supported by a cite to the record, and such cites are particularly important where, as here, the record is extensive").

ment should be presumed to be indemnity costs, although insured may show that costs would otherwise have been incurred under the insurer's duty to defend; remanding for allocation of costs and suggesting that the trial court consider the insured's risk had the studies not been prepared, the extent to which the study was mandated, the extent by which the study could relieve or mitigate potential claims for damages, and the cost of the study in relation to the policy limits); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 790 F.Supp. 1318, 1319 (E.D.Mich. 1992) (concluding that although there may be a prima facie case that expenses were remedial, insured may rebut by showing expenses were necessary and proper to limit remediation costs; defense costs included investigative hydrogeological studies that were reasonable and necessary to limit the scope and cost of remediation and that were the types of studies that an environmental defense lawyer would need to defeat or limit liability).

■ Continental argues that it should not be liable at all, under either defense or indemnity theories, for Domtar's costs to investigate the Sediments Operable Unit, because the March 1991 request for action concerned only the Soil Operable and Tar Seeps Operable Units.

It is unclear why Continental focuses on the request for action. In *SCSC*, the supreme court held that a "suit" by the MPCA, for purposes of invoking the insurers' duty to defend, commences when the MPCA issues a request for information, an RFI. *SCSC*, 536 N.W.2d at 315.

In January 1991, the MPCA notified Domtar that it intended to include the Sediments Operable Unit in the request for action. Although the Sediments Operable Unit was not included in any request for action throughout the trial, the threat of liability remained. In light of this evidence, the trial court did not err by refusing to exclude from the jury those investigation expenses that Domtar incurred relevant to the Sediments Operable Unit.

### 6. Pre-tender costs.

■ Domtar tendered to Continental its defense of the MPCA's action on July 2,

1991. The trial court awarded Domtar its fees and costs incurred to defend the MPCA's action, including those incurred before and after July 2. Continental claims that the court erred by failing to reduce Continental's liability for Domtar's pre-tender fees and costs. In support of this contention, Continental cites a supreme court decision holding that fees may not be recovered if those fees were incurred prior to a formal tender of defense. *SCSC*, 536 N.W.2d at 316–17.

*SCSC* is distinguishable on its facts. Domtar's operations dated back to 1924, and it was necessary to make extraordinary efforts to determine its insurance coverage since then. The record demonstrates that the defense was tendered at the earliest feasible time. Moreover, Continental has consistently refused coverage, and there is no evidence that Continental would have responded favorably to an earlier tender. Under these circumstances, substantially different from those surrounding the tender in *SCSC*, there is no legal cause shown why Domtar should not be entitled to recover its pre-tender defense costs from Continental.

### 7. Additional attorney fee issues.

Continental raises several additional attorney fee issues. Each merits brief attention.

■ a. Continental, in effect, has asked us to overrule the supreme court's decision in *Morrison v. Swenson*, 274 Minn. 127, 142 N.W.2d 640 (1966), where the court concluded that an insured may recover its legal fees incurred to pursue a declaratory judgment action against an insurer. *Id.* at 137–38, 142 N.W.2d at 647. The intermediate appellate court has no authority to overrule a decision by the supreme court. *Mueller v. Theis*, 512 N.W.2d 907, 912 (Minn.App.1994) (citing *Principal Fin. Group v. Allstate Ins. Co.*, 472 N.W.2d 338, 343 (Minn.App.1991) (Davies, J. concurring specially)), *review denied* (Minn. Apr. 28, 1994).

■ b. Continental argues that it should not be liable for Domtar's attorney fees incurred in this action to address the indemnity issues, because the jury did not find a

breach of a duty to indemnify. Rather, Continental argues that it is solely liable for Domtar's attorney fees incurred to establish a duty to defend. *See Lanoue v. Fireman's Fund Amer. Ins. Cos.,* 278 N.W.2d 49, 55 (Minn.1979) (holding that insured may recover from its insurer any attorney fees incurred in successfully attempting to force the insurer to defend an action against the insured); *Morrison,* 274 Minn. at 137–38, 142 N.W.2d at 647 (holding that insured may recover from its insurer any attorney fees incurred in successfully attempting to force the insurer to defend an action against the insured).

In *Independent Sch. Dist. No. 697 v. St. Paul Fire & Marine Ins. Co.,* 515 N.W.2d 576 (Minn.1994), the court recognized that attorney fees are allowed "in a declaratory action by an insured to establish the insurer's contractual duty to defend and indemnify." *Id.* at 581; *see also S.G. v. St. Paul Fire & Marine Ins. Co.,* 460 N.W.2d 639, 645 (Minn. App.1990) (stating that the insured could recover attorney fees incurred to force an insurance company to defend and indemnify the insured), *review denied* (Minn. Nov. 28, 1990). The trial court did not err by concluding that Domtar may recover from Continental its attorney fees incurred to establish coverage and a duty to defend.

c. Continental argues that Domtar should not recover attorney fees and costs related to: (a) issues that were not resolved in this action and (b) claimed breaches of insurance contracts issued by other insurers who did not participate in this action. Continental argues that it would have been reasonably possible to account for these unrelated fees and costs if Domtar's attorneys had segregated billing or made additional details in the billing entries. The post-trial testimony presented by Domtar's witnesses supports the trial court's finding that it would have been impossible to segregate policies and defendants for billing purposes.

d. Continental objects to the hourly rate of Domtar's Washington, D. C., lawyer as excessive. This lawyer, a national environmental insurance litigator, initially charged $400 per hour for representing Domtar. During the course of this lawsuit,

the lawyer's hourly rate eventually increased to $475 per hour.

Based on the post-trial testimony by Domtar's witnesses, the trial court properly found that this lawyer's hourly rate was reasonable and necessary. There was evidence that, for over a decade, the lawyer had a national insurance litigation practice, principally involving toxic tort and environmental coverage disputes; that the lawyer's principal office was in Washington, D.C., where office rents were often four or five times higher than in Minneapolis–St. Paul; that the lawyer's staff customarily worked on evenings and weekends; and that the lawyer did not charge his clients for travel time.

## DECISION

The trial court's decision is supported by the record and the law.

**Affirmed.**